STATE, *ex rel.* LANE DRUG STORES, INC., v. CLYDE H. SIMPSON, as Tax Collector of Duval County

166 Sou. 227.
Opinion Filed November 26, 1935.
Affirmed on Rehearing February 25, 1936.

*Thos. B. Adams, Henry P. Adair, John M. McNatt,* and *Knight, Adair, Cooper & Osborne,* for Relators;

*Cary D. Landis,* Attorney General, and *H. E. Carter* and *J. V. Keen,* Assistants, and *Henry C. Tillman,* for Respondent.

FRANK A. SMITH, Circuit Judge.—This proceeding in mandamus is one of a number of cases pending in this court, all of which attack the validity of Chapter 16848, Laws of Florida, 1935, and which is commonly known as The Chain Store Tax Act, also as Senate Bill No. 724, which

last reference will hereinafter be used for the sake of convenience.

Also because of the necessity for frequent reference thereto as a discussion of the case progresses, it is considered well to copy here the following portions of the Act, to-wit:

"AN ACT to provide for the relief of the public free schools of the State of Florida by raising revenue for the county school fund by levying and imposing a tax upon the privilege of operating a store or stores within this State, to classify such stores for the purpose of such taxation and of graduating the tax in accordance with the number of stores operated under a single ownership, management or control, to declare the public policy on which this Act is founded, to provide for the administration and enforcement of this Act and for the promulgation and enforcement of rules and regulations to facilitate such enforcement to provide for the creation and enforcement of a lien upon the property of persons liable for the payment of such tax; to provide penalties for the violation of this Act and of rules or regulations lawfully made under the authority hereof; to repeal conflicting laws, expressly but on condition including Chapter 16071, Laws of Florida of 1933; and to appropriate the revenues derived hereunder.

"*Be It Enacted by the Legislature of the State of Florida:*

"Section 1. DECLARATION OF POLICY. It is hereby determined and declared that extensive new revenues are required to promote education and to preserve the common school system of the State of Florida; and that in the raising of such revenue it is expedient to levy a privilege tax upon the occupation of engaging in and continuing in the business of operating of retail stores in the State of Florida in lieu of that heretofore provided by Chapter 16071 of the Laws of Florida, 1933, and in addition to all other

taxes; and that due to the greater specialization in management and methods and advantages of mass buying, of intensive selling, of more efficient utilization of capital assets, of the specialized character of their merchandising and the more efficient coverage and results obtained from their advertising, stores operated in multiple units enjoy an advantage over individually owned and operated single stores to the extent that it is fit and proper that such stores should be separately classified for the purpose of such privilege taxation; and further, that the increasing growth of chains and greater multiplication of units of stores tend to foster monopoly and to create unemployment by driving out of business their competitors who do not enjoy such advantage and that therefore the multiplication and extension of such units of chain stores should be discouraged as a matter of public policy.

"Section 4. TAX. For the privilege of continuing in or engaging in the business of a retailer as defined in this Act, there is hereby imposed upon every person, firm, corporation, association or co-partnership, trust or joint stock company, and any firm however organized or whatever be the plan or operation, shall under the terms of this Act be required to obtain a permit or license to operate a store in this State, a tax which shall be equal to the amount due under the provisions of Subdivision A, and the amount due under the provisions of Subdivision B of Section 4 of this Act; in order to equitably and properly fix the formula upon which the herein license fees shall be based and so that the factor of number of stores and the factor of amount of business done under the privilege shall be included in the formula. The specific amount to be determined as follows:

## "SUBDIVISION A

"CLASS 1. Upon one store, the flat sum of $10.00.

"CLASS 2. Upon chains of more than one but not more than three stores, the flat sum of $50.00 for each said store.

"CLASS 3. Upon chains of more than three but not more than six stores, the flat sum of $100.00 for each said store.

"CLASS 4. Upon chains of more than six but not more than ten stores, the flat sum of $200.00 for each said store.

"CLASS 5. Upon chains of more than ten but not more than fifteen stores, the flat sum of $300.00 for each said store.

"CLASS 6. Upon chains of more than fifteen stores the flat sum of $400.00 for each said store.

## "SUBDIVISION B

"CLASS 1. Upon one store, also an amount equal to one-half of one per cent. of the gross receipts from all sales as defined in this Act.

"CLASS 2. Upon chains of more than one but not more than three stores, also an amount equal to one per cent of the gross receipts from all sales as defined in this Act.

"CLASS 3. Upon chains of more than three but not more than six stores, also an amount equal to two per cent. of the gross receipts from all sales as defined in this Act.

"CLASS 4. Upon chains of more than six but not more than ten stores also an amount equal to three per cent. of the gross receipts from all sales as defined in this Act.

"CLASS 5. Upon chains of more than ten but not more than fifteen stores, also an amount equal to four per cent. of the gross receipts from all sales as defined in this Act.

"CLASS 6. Upon chains of more than fifteen stores, also an amount equal to five per cent. of the gross receipts from all sales as defined in this Act.

"The tax imposed under Subdivision B of this section shall be calculated upon the gross receipts of the total number of stores in each respective chain concerned at the rate prescribed in the applicable class bracket of the foregoing schedules.

"If the tax in Subdivision B of this section be, for any reason, held invalid and inoperative, then the taxes in each of the six classes of stores enumerated in Subdivision A of this Section shall be twice the amount set forth in said Schedule A, in lieu of the rates therein prescribed.

"Section 7. AMOUNT OF TAX. The taxes levied and imposed by Subdivision A of Section 4 of this Act shall be due and payable on the first day of July of each and every year, at which time the Comptroller of the State of Florida shall issue the license after ascertaining from the applicant therefor the facts with reference to the number of stores owned or controlled by said applicant. The taxes levied and imposed by Subdivision B of Section 4 of this Act shall be paid monthly and for the purpose of ascertaining the amount every person coming within the provisions of this Act, on or before the fifteenth day of August, 1935, and on or before the fifteenth day of every calendar month thereafter, individually or by duly authorized officer or agent, shall make and file with the Comptroller a written return, in the manner and form designated or prescribed by said Comptroller, and upon blanks furnished by him showing the amount of gross receipts from sales by such person during the preceding calendar month and the amount of tax for which such person is liable for the current calendar month, and with such written return such person shall remit to the Comptroller the amount of said tax due from such person.

"(a) In case of credit and time sales the amount thereof

shall be included in the gross receipts for the month in which payments are received by the person, without any deduction therefrom on account of the cost of the property sold, the cost of materials used. labor or service cost, interest paid,. losses or other expense whatsoever.

"(b) If the amount due by any person as the tax imposed by this Act is not paid on or before the date prescribed for its payment, there shall be collected, as a part of the tax, interest upon said unpaid amounts, at the rate of two per centum (2%) per month from the date prescribed for its payment until it is paid.

"(c) It shall be the duty of every person required to make a report and pay any tax under this Act, to keep and preserve suitable records of the gross proceeds of sales taxable under this Act, and such other books of account as may be necessary to determine the amount of tax due hereunder; and it shall be the duty of every person to keep and preserve, for a period of two years, all invoices and other records of goods, wares or merchandise purchased for resale; and all such books, invoices and other records shall be open to examination, at any time, by the Comptroller or any one of his duly authorized agents.

"(d) Any permit holder may take credit on any tax payable for the privilege of doing business under Section 4 of this Act on tax due under Subdivision A or in the months of August or September, 1935, due under Subdivision B for the proportional unexpired portion of the amount paid for any license heretofore obtained by him under the provisions of Chapter 16071, aforesaid.

"Section 9. TIME OF PAYMENT. At the time of transmitting the return required hereunder, to the Comptroller, the person shall remit therewith, to said Comptroller, the amount of the tax due under the applicable provisions of

this Act, and failure to pay such tax, at the time for filing the return, shall cause said tax to become delinquent. All taxes provided for herein are due and payable at the offices of the State Comptroller at Tallahassee, Florida.

"Section 16. REPEALER. That Chapter 16071, of the laws of Florida, 1933, be and the same is hereby repealed, provided that this section shall not be effective in the event that Section 4 of this Act should be invalid.

"Section 18. SAVING CLAUSE. If any section, sub-section, sentence, clause, phrase or word of this Act, is for any reason, held or declared to be unconstitutional, inoperative or void, such holding or invalidity shall not afiect the remaining portions of this Act; and it shall be construed to have been the legislative intent to pass this Act without such unconstitutional, inoperative or invalid part therein; and the remainder of this Act after the exclusion of such part or parts shall be deemed and held to be valid as if such excluded parts had not been included herein; or if this Act or any provision thereof shall be held inapplicable to any person, groups of persons, property, kind of property, circumstances or set of circumstances, such holding shall not affect the applicability thereof to any other person, property or circumstance."

The Act was approved June 1, 1935.

Opposing counsel have agreed upon the statement as to the allegations of the alternative writ as follows, to-wit:

"In the mandamus proceedings, it is made to appear that Lane Drug Stores, Incorporated, which operates eleven retail drug stores in the State of Florida, all of which are located in Duval County, has tendered the filing fees and license fees prescribed by Chapter 16071, Laws of Florida, 1933, for the opening and operation of retail stores, and has demanded of the Respondent R. H. Carswell (now de-

ceased) and of his successor, Clyde H. Simpson, the li-
censes to which it is entitled under the provisions of Chap-
ter 16071, Laws of 1933. The tenders were refused by
the respondent Carswell and by his successor, the respond-
ent Simpson, on the sole ground that before obtaining a
license to operate its retail stores, Lane Drug Stores was
required to pay the tax sought to be imposed by Section 4
of Senate Bill No. 724 (Chapter 16848, Laws of Florida,
1935), viz.: As an operator of eleven retail drug stores,
Lane Drug Stores is required to pay the fees and taxes
sought to be imposed by Class 5 of Subdivision A and
Class 5 of Subdivision B of Section 4 of Senate Bill
No. 724.

"Lane Drug Stores asserts that it is not required to pay
the tax imposed by Senate Bill No. 724, and that it is not
required to comply with any of the terms or provisions of
Senate Bill No. 724, because of the fact that the Act is
effective to deprive it of its constitutional rights under the
Fourteenth Amendment to the Constitution of the United
States and under Sections 1 and 12 of the Declaration of
Rights of the Constitution of Florida, and has been held
to be void in its entirety by the Circuit Court of Leon
County, Florida. In particular, it is asserted that Senate
Bill No. 724 is void, because the classifications made in the
Act rest upon no rational foundation, nor upon any differ-
ence which bears any reasonable and just relation to the
nature and purpose of the Act, and that the classifications
are whimsical and arbitrary. Likewise, it is asserted that
the taxes sought to be imposed by Senate Bill No. 724 are
unjustly discriminatory and unequal, and that they are
confiscatory and will destroy a substantial number of ef-
ficiently managed and lawful businesses. And in the man-
damus proceedings it is sought to compel the respondent

(Simpson) to accept the tendered fees and issue licenses as it is his duty to do under the provisions of Chapter 16071, Laws of Florida, 1933, or show cause why he refuses so to do."

The respondent filed a pleading styled "Answer to Alternative Writ" to which relator has filed a motion to strike numerous portions and a demurrer, and the case is before the court on this motion and demurrer. While the briefs and argument were made applicable to both motion and demurrer, we find it expedient to first devote our attention to a consideration of the demurrer.

The question of lack of jurisdiction of the court to deal with the legality of a tax having been suggested, we will first dispose of that matter, as a court should always promptly determine any question of its jurisdiction.

The contention is presented that the circuit court has exclusive jurisdiction to determine the validity of a tax under Article V of the Constitution, and that although under the Constitution this Court has original jurisdiction to issue the writ of mandamus, yet it may not do so if the determination of the validity of a tax is involved. In numerous cases in the past this court has taken jurisdiction in mandamus when the legality of a "tax, assessment, or toll" was involved in the attack made therein upon the validity of the law under which such "tax, assessment, or toll" was sought to be levied and collected and we have exercised such original jurisdiction without question. We do not construe the Constitution of Florida to so limit the power of this court.

The provision of Section 11, Article V that "the circuit courts shall have exclusive original jurisdiction * * * in all cases involving the legality of any tax, assessment, or toll," does not limit the jurisdiction conferred by Section 5, Ar-

ticle V upon the Supreme Court to "issue writs of mandamus, certiorari, prohibition, quo warranto, habeas corpus and also all writs necessary or proper to the complete exercise of its jurisdiction." As used in Section 11, the provision first above quoted is intended to exclude from inferior courts of original jurisdiction "all cases involving the legality of any tax, assessment, or toll."

The allegation (Par. XVI) that Senate Bill No. 724 was not passed by the Legislature until after midnight of May 31, 1935, and the Legislature had become *functus officio* is contradicted by the records of the Legislature and of the Secretary of State, of which the court takes judicial notice and will follow as correct. Before any attack upon the legislative proceedings can be sustained, the relator must overcome the binding effect of those governmental records by procuring their change to support his contentions.

Paragraph XVII of the alternative writ alleges the granting of an injunction in the Circuit Court in and for Leon County in the case of Bond-Howell Lumber Co., a corporation, *et al.*, Plaintiffs, versus J. M. Lee, as Comptroller, adjudging Senate Bill No. 724 to be unconstitutional and void in its entirety, and enjoining the Comptroller from enforcing the Act, and that the relator (petitioner) was a party to said cause and that the judgment of the court in that case is still in full force and effect and has not been superseded or set aside and there has been no appeal therefrom. Of course, the respondent not being a party to that proceeding, is not bound by the judgment, and the allegations as to same do not add anything to the writ herein.

For the reasons hereinafter stated, we are of the opinion that we cannot uphold the portion of the Act levying a graduated tax upon the chain stores equal to a prescribed percentage of the gross receipts from all sales, the rate and amount

of tax being fixed according to the class in which any chain may fall, the classes being established according to the number of stores. This construction eliminates Subdivision B except the first paragraph thereof. This brings us to a discussion of whether such part of the Act may be stricken and the remainder sustained without doing violence to the intention of the Legislature—whether the lawmaking body would have passed the Act as it will stand with that portion stricken.

Counsel have argued that the graduated gross receipts tax factor is invalid, to which we agree, and they say its invalidity "renders the entire Act unconstitutional, for it is an essential part of the scheme, and its elimination works a result not intended by the Legislature," and cited in support cases decided by this court as follows, to-wit: Almeriggoto v. Jarvis, 95 Fla. 914, 117 So. 793 (1928) ; Ex parte Smith, 100 Fla. 1, 128 So. 864 (1930) ; Teuton v. Thomas, 100 Fla. 78, 129 So. 330 (1930) ; Ramsey v. Martin, 111 Fla. 798, 150 So. 256 (1933) ; also State v. Hilburn, 70 Fla. 55, text 62, 69 So. 784, and quote from it the rule that "If any of the provisions of the Act are held to be illegal induced to any appreciable extent its passage, the entire Act fails in view of the interdependence of the provisions."

Their brief also states: "Likewise, if the legislative record shows that an Act would not have been passed with the unconstitutional provision eliminated, then the entire Act is void," and cites therefor Ramsey v. Martin, supra. They say these rules apply notwithstanding a legislative declaration that any invalid provision shall not affect the remainder of the Act, and cite Railroad Retirement Board v. Alton R. Co., 295 U. S. 330, 55 Sup. Ct. 758, 79 L. Ed. 1468, and authorities cited therein at text page 1482.

Their brief then states: "They apply to scheme of tax-

ation, and where an invalid section is part of an entire scheme, the courts may be required to declare the whole scheme invalid," for which proposition they cite Pollock v. The Farmers' Loan & Trust Co., 158 U. S. 601, 39 L. Ed. 1108; 15 Sup. Ct. Rep. 912; and Hill v. Wallace, 259 U. S. 44, 66 L. Ed. 822, 42 Sup. Ct. Rep. 452.

We construe the tax imposed to be for revenue and for the privilege of engaging in or continuing in business. It is clear that the Legislature wanted to have two factors used in computing the amount of tax that any store or chain of stores should pay, although it was evidently in doubt as to the validity of Subdivision B for use as a factor, hence the inclusion of the last paragraph of Section 4, attempting to double the amount of tax set forth in Subdivision A in event Subdivision B should be held invalid and inoperative.

Surely if a "saving clause" can ever be framed so as to be effective to protect a legislative Act against an onslaught upon its validity, Section 18 is broad and comprehensive enough to accomplish such result. The Legislature solemnly declared that if any section, sub-section * * * of this Act is for any reason held or declared to be unconstitutional, inoperative or void, such holding of invalidity shall not affect the remaining portions of this Act; *and it shall be construed to have been the legislative intent to pass this Act without such unconstitutional, inoperative or invalid part therein;* and the remainder of this Act after the exclusion of such part or parts shall be deemed and held to be valid as if such excluded parts had not been included herein," etc.

That is unmistakably clear and strong language, and if possible to do so without offending against some recog-

nized canon of statutory interpretation, full effect should be given thereto.

In the case of Di'Lustro v. Fenton, Sheriff, the court expressed serious doubt as to the validity of certain exemptions contained in the statute which was under attack, and speaking through Judge Barns, said: "but assuming, without adjudicating, that to allow the exemptions to stand would make the Act unconstitutional, we are then confronted with Section 24, *supra,* and the general principle of law, that,

"If a duly enacted statute contains provisions that are invalid because in conflict with organic law, and such invalid portions may be severed, and the remainder of the statute then be made effective for the purpose designed, and will not cause results not intended by the Legislature, and it does not appear that the statute would not have been enacted without the invalid portions, the invalid portions of the Act should be disregarded and the valid portions enforced, if it can be done, to effectuate the legislative intent." State v. Phillips, 70 Fla. 340, 70 So. 367, 370, Ann. Cas. 1918 A, 138. See, also, Cooley's Constitutional Limitations (8th Ed.) 360.

"If on the one hand the exemptions are to stand and the result is to make the Act invalid, or on the other hand the exemptions enumerated can be stricken out and that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected, the law must be sustained with the unconstitutional portion stricken. See Cooley's Constitutional Limitations (8th Ed.) 359-363." Di'Lustro v. Fenton, Sheriff, 106 Fla. 198, 142 So. 899.

An examination of Section 24 of Chapter 14650, Laws of Florida, 1931, shows that it is in effect substantially

the same as Section 18 of Senate Bill No. 724, but if there is any difference in the proficiency of the two respective provisions to preserve the unobjectionable part or parts of a statute, Section 18 is in our opinion the stronger and more effectual of the two.

It is noteworthy that this Court, speaking through an able opinion by Mr. Justice TERRELL in the case of Liggett, v. Lee, 109 Fla. 477, 149 So. 8, upheld the remaining provisions of the 1931 Chain Store Tax Act after the Supreme Court of the United States had held certain other provisions thereof invalid.

It will be observed that there is a striking similarity between Sec. 18 of Senate Bill 724 and Sec. 15 of Chapter 15624, which was quoted in that opinion and which we quote again, as follows:

"If any section, provision or clause, of this Act shall be declared invalid or unconstitutional, or if this Act as applied to any circumstances shall be declared invalid or unconstitutional, such invalidity shall not be construed to affect the portions of this Act not so held to be invalid or the application of this Act to other circumstances not so held to be invalid."

If there is any substantial difference between the two sections, that in the later Act is the broader and more efficacious.

In the Liggett-Lee case, *supra,* it was ably stated:

"Under the terms of Section 15 as here quoted, such an elimination is warranted. The Act as a whole evinces a purpose on the part of the Legislature to impose a license tax on chain stores, and Section 15 provides that if any section, provision, or clause thereof, or if the Act as applied to any circumstances shall be declared invalid or unconstitutional, such invalidity shall not affect other por-

tions of the Act held valid nor shall it extend to other circumstances not held to be invalid.

"Under the liberal terms of Section 15 it may be reasonably discerned that the Legislature intended that the Act under review should be held good under any eventuality that did not produce an unreasonable, unconstitutional, or an absurd result. Such provisions as are contained in Section 15 have been frequently upheld by the courts. Citing authorities.

"Such legislative declarations as are contained in Section 15 serve notice on the courts of a legislative intent to uphold separable portions of an Act partially invalid which would have been eliminated in passage if the Legislature had been advised of the invalidity. The test to determine workability after severance, and whether the remainder of the Act should be upheld, rests on the fact of whether or not the invalid portion is of such import that the valid part would be incomplete or would cause results not contemplated by the Legislature. If the objectionable part of the Act can be severed in such a way that the Legislature would be presumed to have enacted the valid portion without the invalid part, the failure of the latter will not render the entire statute invalid." Citing authorities.

Moreover, this construction is further supported by the attitude of the court as expressed in the case of City of DeLand v. Florida Public Service Co., and later quoted at great length, in which the entire ordinance was held void without any attempt to reject the objectionable portions and sustain the rest, because the exercise of the legislative authority of a municipality is not limited to being done only at limited and long separated seasons, such as is the case where a law made by the Legislature itself is involved. 119 Fla. 804, 161 735, text 740.

Even as it was judicially determined in Liggett v. Lee, *supra,* that "the Act as a whole evinces a purpose on the part of the Legislature to impose a license tax on chain stores," etc., so it is equally true that Senate Bill 724 evinces a purpose on the part of the Legislature to raise the required extensive new revenues to promote education and to preserve the common school system of the State of Florida; to levy a privilege tax upon the occupation of engaging in and continuing in the business of operating retail store in lieu of Chapter 16071, Laws of Florida, 1933, and in addition to all other taxes; and to grade that tax according to the superior advantages that might be obtained by more extensively operated stores. When the declaration of policy is kept in mind and the strong and unequivocal language of Section 18 is considered, and especially in conjunction with the holding in the Liggett-Lee case, *supra,* we feel warranted in reaching the conclusion that the Act without the graduated gross receipts tax factor is in conformity with the intention of the Legislature; that if they had been advised of the invalidity of these provisions (as they did have misgivings about the entire Subdivision B), they would have eliminated them from the bill and enacted the remainder of the bill.

The respondent contends that it was the intention of the Legislature to impose a single tax upon each chain of stores, as well as a single tax upon any one retail store which was not a part of a chain as that term is defined in the Act. We agree such is the whole tenor of the Act and the fact that two separate and distinct and not necessarily related factors are provided as factors to be used in the computation of the tax in nowise changes the character of the tax, but it continues as a single tax imposed upon a single retail store which is not part of a group or chain,

but is the only store under the same ownership, management or control, likewise it is the same when applied to the composite group unit, consisting of more than one store under the same ownership, management or control and falling within the classification of a "chain," "chain stores" or "chain of stores" as defined in the Act.

Such a tax is permissible, unless it is so framed as to violate some provision of organic law.

The respondent relies upon the case of City of DeLand v. Florida Public Service Co., 119 Fla. 804, 161 So. 735, and in their brief counsel have in presenting that case, very clearly and tersely stated:

"The Court there had under consideration an ordinance of the City of DeLand imposing a tax upon the gross receipts from the sale of electricity. Mr. Justice DAVIS, speaking for the Court in his characteristic way, drew a clear line of demarcation between a tax upon gross receipts as such and a tax upon the privilege of future operations, the former, a tax upon an act already done, namely, the collection of gross receipts, 'because it has been so collected,' as said the Court, and the latter, a tax upon a privilege desired to be enjoyed in the future, the amount of the latter tax to be measured by the application of a particular rate to gross receipts collected during a preceding period.

The brief then quotes from the opinion in that case, to-wit:

"Since a tax must be determined by its practical effect and operation rather than by particular descriptive language applied to it, a tax that can be levied only where an individual, firm or corporation both seeks, or exercises, a taxable privilege of doing business in one year and has been in receipt of profits, income, or gross receipts during its preceding fiscal year which is made the basis of computation

of the tax on the privilege proposed to be renewed and continued for another year, such tax is obviously not a direct tax on the income or receipts of such a person, firm or corporation, but is to be construed as an excise tax on the privilege exercised, or proposed to be exercised, computed on the basis of past receipts or income and paid in advance for the next succeeding year computed for the current tax period on the basis of the person, firm, or corporation's receipts or income for its preceding fiscal year. Educational Films Corp. v. Ward, 282 U. S. 379, 51 S. Ct. 170, 75 L. Ed. 400, 71 A. L. R. 1226. Thus it is not a direct tax upon the gross receipts or gross income realized in a given year collectible upon a report and ascertainment thereof, but it is a tax for the privilege of doing business in one year measured by the gross receipts of income accruing from the business in the preceding fiscal year. Bass, Ratcliff & Gretton v. State Tax Commission, 266 U. S. 271, 45 S. Ct. 82, 69 L. Ed. 282."

As was so aptly stated by the author in the above quoted paragraph in reference to the character of the tax, "a tax must be determined by its practical effect and operation rather than by particular descriptive language applied to it."

In the same opinion it was further stated:

"But, like all tax measures when called in question in the courts, the nature of the instant tax ordinance is to be determined by its practical operation and effect rather than by what it is named. Thus it must be tested by the character of its incidence upon the subject at which it is directed and by the manner in which it affects the taxpayer in its practical operation in the course of its administration, and in that view of it only will the courts undertake to weigh and determine its validity in the light of the limitations of the state and national Constitutions. Spoliation under the

guise of taxation always will be declared unconstitutional, whatever its name or form." (Authorities cited.)

And further on in the same case we find the statement: "What controls the judgments of the courts in matters like the present is the *underlying reality of the tax* ordinance as it is intended to put into practical operation and effect."

In analyzing the DeLand ordinance, the court, among other features, pointed out: "* * * (5) it constitutes a direct and immediate burden upon each transaction of sale of electricity by the company in proportion to its magnitude and irrespective of whether the transactions singly, or *en grosse,* are profitable or otherwise; (6) it arises against the power company whether or not its profits are large or small and irrespective of whether any gain at all is realized by the power company over and above expenses and losses; (7) it is more than a reasonable statutory corporate net income tax, which under Section 11 of Article 9 of the State Constitution may or may not, be prohibited as to corporations; in that it may conceivably take all of the producer's net income and leave him no residue whatever."

And the writer further proceeds to say:

"The difference in effect between a tax measured by gross receipts and one measured by net income is recognized in many decisions. It is manifest and substantial. Moreover, it affords a convenience and workable basis of distinction between a direct burden upon the business affected and a charge that it is only indirect and incidental.

"A tax upon gross receipts, or gross income from all transactions of a business corporation, for the privilege of doing the business in which the taxed gross receipts or income are realized, affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise. Conceivably it is often sufficient to make the

difference between profit and loss, or to so diminish the profit as to impede or entirely discourage the conduct of the business affected. Thus it is materially variant from a tax upon net profits which has no such effect. (Authorities cited.)

"It is generally conceded as a matter of common knowledge that the gross sales of a saleable commodity or service do not bear any constant relation to the net profits of the seller and that gross receipts yield differing ratios of profit dependent upon the character of what is sold as well as the volume of transactions. (Citing authority.) * * *

"This court is committed to the doctrine that the privilege of selling, buying, using, or distributing for use, electricity, gas, and like public utility services, is a proper object of taxation in the form of an excise tax on the privilege so enjoyed computed according to any reasonable or lawful method of ascertainment. (Citing authorities.)

"There is a logical and practical distinction, however, between a tax laid directly upon the gross receipts or gross income of a business to be assessed and collected upon the gross receipts or gross income already collected, because it has been so collected, and a tax on gross receipts or gross income which can in no case have any incidence unless the taxpayer seeks to enjoy, or enjoys, a privilege which is the proper object of excise taxation on such privilege, and which would not be open to judicial interference if its amount were arrived at by any other nondiscriminatory method of computation than according to the measure of gross receipts or gross income enjoyed or realized on the privilege during a preceding period of time."

The final discussion then about a privilege tax for one year computed upon the basis of the receipt of profits, income or gross receipts during its preceding fiscal year, is

dealing with yearly periods, one year used as a basis for determining the tax for the next year. Although the tax levied under Subdivision A is for the yearly period (Sec. 7), and it is to be noted that occupational taxes in this State have always, with few exceptions, been payable annually. Yet there is no constitutional requirement to prevent the Legislature in its wisdom providing for the payment of license taxes in installments or to require or permit more frequent than annual payments; still in our scheme and system of taxation and the collection thereof in its several different forms, that is ad valorem licenses, and poll taxes, a yearly plan for enforcement has been almost universal.

The practical effect of the payment of a tax along the first of the month (not later than the 15th) in an amount equal to a certain percentage or part of the gross receipts of the preceding month is that it is a tax upon the very receipts which have been collected for the previous month, notwithstanding the statute says that it is exacted for the month which is being entered.

We hold that the imposition of the flat taxes as specified in the several classes under Subdivision A and the one-half of one per cent. of the gross receipts as specified in Class I of Subdivision B from all sales as defined in the Act (Subdivision B, Class I) constitutes a lawful tax upon the privilege of engaging or continuing in business. The superior advantages and the greater opportunity for obtaining business and operating more efficiently and successfully because of the grading of stores and the larger the group the correspondingly broader opportunities derived, afford just and reasonable classification for the graduated tax according to the number of stores. While we are not aware of a statute of another State that has so broadly classified by such large steps instead of graduating the tax

by the increase of each store, yet we do not perceive that such a classification is unreasonable. Some injustice is bound to result from any general rule of classification, and equal protection demands only reasonable conformity in dealing with parties similarly circumstanced. Stewart Dry Goods Co. v. Lewis, *et al.*, 294 U. S. 550, 55 Sup. Ct. 525 (March 11, 1935), 79 L. Ed. 1054.

Whatever part of the graduated tax imposed is sustained must be upheld upon the legal ground as being for a privilege enjoyed or to be enjoyed and not based contrary to any recognized principle of law.

Under Subdivision A the store or chain of stores pays for the privilege of enlarging or continuing in business and there is no unjust discrimination as between the different classes. Under Class I of Subdivision B all stores are treated alike, so that none can complain, for each store or each store in a chain of stores must pay identically the same rate of tax. However, under the different classes of Subdivision B we find that the chain store would not merely be paying for a privilege of greater opportunity which it has already obtained by complying with the law and paying the flat tax applicable to its classification but it is being charged also according to if not for what it has collected during the preceding month without any logical relationship between the amount of its collections (receipts) and a commensurately enhanced opportunity to be enjoyed in the new month. We see no logical reason for saying that A should pay a higher tax because he has sold and collected for an article of merchandise a certain price than B should pay for selling and collecting for the same article at the same price, simply because B had a greater number of stores and had collected more money during the previous month.

It has been strongly urged that the statute is retroactive

in its operation because when the number of stores is increased so as to progress into the higher bracket or class and thereby increase the amount of tax per store throughout the entire chain as it has been increased by the addition of stores, and not merely make the higher rate applicable to the added stores. In considering this question, it should be kept in mind that the tax is against the composite group of stores constituting the "chain" or system and the privilege of operating it, and is not a tax against the individual stores making up the "chain," which is the unit of taxation, although the number of stores is used for determining the classification of the chain unit of which they are parts and the amount of license fees to be paid by the chain unit so formed and classified.

While the tax was quite different, yet the same underlying principle was present in the Mangoun inheritance tax case, so that we deem it applicable in the instant case. There the United States Supreme Court held that the frame of the tax act whereby a higher rate was required upon the entire amount of a higher sum was not an arbitrary classification. Mr. Justice McKenna speaking for the court first quoted the section of the statute under attack and proceeded to discuss its effect, as follows, to-wit:

"There are four classes created, and manifestly there is equality between the members of each class. Inequality is only found by comparing the members of one class with those of another. It is illustrated by appellant as follows: One who receives a legacy of $10,000, pays three per cent., or $300, thus receiving $9,700, net, while one receiving a legacy of $10,001, pays four per cent. on the whole amount, or $400.04, thus receiving $9600.96, or $99.04 less than the one whose legacy was actually $1 less valuable. This method is applied throughout the class.

"These, however, are conceded to be extreme illustrations, and we think, therefore, that they furnish no test of the practical operation of the classification. When the legacies differ in substantial extent, if the rate increased, the benefit increases to greater degree.

"If there is unsoundness, it must be in the classification. The members of each class are treated alike; that is to say, all who inherit $10,000 are treated alike—all who inherit any other sum are treated alike. There is equality, therefore, within the classes. If there is inequality, it must be because the members of a class are arbitrarily made such, and burdened as such, upon no distinctions justifying it. This is claimed. It is said that the tax is not in proportion to the amount, but varies with the amounts arbitrarily fixed, and hence that an inheritance of $10,000 or less pays three per cent., and that one over $10,000 pays, not three per cent. on $10,000, and an increased percentage on the excess over $10,000, but an increased percentage on the $10,000 as well as on the excess; and it is said, as we have seen, that in consequence one who is given a legacy of $10,001 by the deduction of the tax receives $99.04 less than one who is given a legacy of $10,000. But neither case can be said to be contrary to the rule of equality of the fourteenth amendment. That rule does not require, as we have seen, exact equality of taxation. It only requires that the law imposing it shall operate on all alike, under the same circumstances. That tax is not on money; it is on the right to inherit, and hence a condition of inheritance, and it may be graded according to the value of that inheritance. The condition is not arbitrary because it is not determined by that value; it is not unequal in operation because it does not levy the same percentage on every dollar—does not fail to treat all alike under like circumstances and conditions,

both in the privilege conferred and the liabilities imposed. * * * All license laws and all specific taxes have in them an element of inequality. Nevertheless they are universally imposed, and their legality has never been questioned. We think the classification of the Illinois law was in the power of the Legislature to make, and the decree of the circuit court is affirmed." Magoun v. Illinois Trust and Savings Bank, *et al.,* 170 U. S. 283, 18 S. C. Rep. 594; 42 L. Ed. 1037.

The Supreme Court of Idaho in a very forceful opinion upheld its statute which provided that whenever a chain of stores would be increased so as to pass into the higher bracket, then the higher tax which was specified for the higher bracket should be applicable to all stores in the chain and not be confined to the excess above that allowable in the lower class from which it had advanced. The opinion was rendered in the decision of the case of Penney Co. v. Diefendorf, 32 Pac. (ed) 784, in which the Magoun case, *supra,* is cited and quoted; likewise the State Board of Tax Commissioners of Indiana v. Jackson and Liggett v. Lee, two other leading cases decided on chain stores taxation and hereinafter extensively quoted and discussed. There in dealing with the alleged retroaction, the court pointed out the difference in the fee schedule of their Act and those of Indiana and Florida, which gave rise to the Liggett-Lee and the Jackson cases, saying "in the Idaho Act the increased fee on the additional stores covers each store in the chain * * *. But the Idaho Legislature made a classification based on groups, the fee depending upon the number of units comprising each group." After stating that the provisions of Section 5 were not retroactive, the court said:

"The word retroactive, generally speaking, has reference

to the time element involved. A statute which takes away or impairs vested rights acquired under existing laws is retroactive. Construing Section 5, time element is not involved, for the statute simply means that when an additional store is added to the chain automatically a new classification of the group is created, and not only the additional store but all other stores are taxed on a new basis. This tax in question is a license or privilege tax on store operations. (Quotation from Liggett Co. v. Lee.) * * *

The expanding of the chain is obviously advantageous or the expansion of chains throughout the country would not have progressed. When one store is added the reaction is the same upon all of the stores. The advantages of all sorts of so-called chain store merchandising methods are equally applicable to all of the stores even though the chain is expanded by only one store. Otherwise, manifestly, such expansion would not be advantageous. With the advantages of chain store merchandising affecting every store by reason of the privilege of expanding by one or more stores, it cannot be said that the Legislature was unreasonable in increasing the tax upon all stores in the chain for the privilege of such expansion."

In reaching our conclusions as to the validity of Subdivision A we have been considerably influenced by the decision to similar effect by the three-judge Federal court and the views so ably expressed in the opinion of Honorable A. V. Long, District Judge, who, until he recently accepted the call to the Federal bench, was a most distinguished jurist of the Florida bench. That court seems to have relied somewhat upon the Jackson case, as we have, and the recent case of Fox v. Standard Oil Co., recently decided by the Supreme Court of the United States, which is quite a strong precedent for our decision and from which we wish

to repeat the same quotation therefrom used by Judge Long, to-wit:

"When the power to tax exists, the extent of the burden is a matter for the discretion of the lawmakers. * * * 'Even if the tax should destroy a business, it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk.' * * *

"A chain, as we have seen, is a distinctive business species, with its own capacities and functions. Broadly speaking, its opportunities and powers become greater with the number of the component links; and the greater they become, the more far-reaching are the consequences, both social and economic. For that reason the State may tax the large chains more heavily than the small ones, and upon a graduated basis. * * *

"If only one form of chain chooses so to multiply its units, after arriving at the topmost levels, as to make the burden heavy, it owes its position on the scale and the aggravation of the tax to the exigencies of business and not to those of law. The classification is not arbitrary, but in its normal operation has a rational relation to the subject matter to be taxed, the capacity to pay, and the justice of the payment. * * *

"We have never yet held that the government, in levying a graduated tax upon all the members of a class must satisfy itself by inquiry that every group within the class will be able to pay the tax without the sacrifice of profits. The operation of a general rule will seldom be the same for everyone. If the accidents of trade lead to inequality or hardship, the consequence must be accepted as inherent in government by law instead of government by edict." Fox v. Standard Oil Co., 294 U. S. 87, 55 Sup. Ct. 333, 79 L. Ed. 780; Lane Drug Stores, *et al.,* v. Lee, as Comptroller,

Dist. Court. of U. S. Northern Dist. of Fla., July 29, 1935, 11 Fed. Supp. 672-675.

In the last cited case following the above repeated quotations, the writer then stated:

"We have reached the conclusion that so far as Subdivision 'A' of the section is concerned, the classification is not so discriminatory, arbitrary, and unreasonable as to destroy the legislation.

"As was said in Fox v. Standard Oil Company, *supra*:

"'The tax now assailed may have its roots in an erroneous conception of the ills of the body politic or of the efficacy of such a measure to bring about a cure. We have no thought in anything we have written to declare it expedient or even just, or for that matter to declare the contrary. We deal with power only.'"

"The passage of the Act by the Legislature had but one purpose, the collection of revenue by imposing a license tax upon certain businesses operating in the State that sufficient funds might be available for the relief of the public schools." Lane Drug Stores v. Lee, *supra.*

The language used in the Stewart-Lewis case, *supra,* decided recently, is quite appropriate here, and we quote Mr. Justice ROBERTS, saying:

"The appellees seek to avoid the arbitrary character of the classification of sales for the purpose of imposing the levy by the claim that the Act, properly construed, lays an excise upon the privilege of merchandising at retail and the exaction is made only for this privilege. They insist the amount of tax is merely measured by the volume of sales, and in this view the classification is not arbitrary if any reasonable relation can be found between the amount demanded and the privilege enjoyed. They endeavor to deduce such a relation from the alleged fact that a merchant's

net income and his consequent ability to pay increase as the volume of his sales grows. The argument does not advance the case for the validity of the statute. Even in this aspect the classification is arbitrary, for the claimed relation of gross sales—the measure of the tax—to net profits fails to justify the discrimination between taxpayers.

"The district court found that 'generally speaking' he who sells more is in receipt of a greater profit and hence has larger ability to pay, and upon this basis justified the classification. But it is to be remembered that the Act in question taxes gross sales and not net income. As stated in United States Glue Co. v. Town of Oak Creek, 247 U. S. 321, 328:

" 'The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon the business affected and a charge that is only indirect and incidental. *A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise. Conceivably it may be sufficient to make the difference between profit and loss, or to so diminish the profit as to impede or discourage the conduct of the commerce.* A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large.' " (Italics ours.)

Although not in all respects applicable to the instant case, because the Kentucky statute involved in the Stewart case was only a graduated gross sales tax, ranging from 1/20th of one per cent. on the first $400,000 sales and graduated up by degrees to one per cent. on sales over $1,000,000, yet

it is so much in point that we find it useful to quote the last paragraph as a medium of expressing our thought along that line:

"In several recent cases we sustained the classification of chain stores for taxation at rates higher than those applicable to single stores, and graduated upward on each store as the total number of units in one ownership increased. We found this classification reasonable because of advantages incident to the conduct of multiple stores and obvious differences in chain methods of merchandising as contrasted with those practised in the operation of one store. The instant cases present a classification of quite another kind. The Kentucky statute ignores the form of organization and the method of conducting business. The taxable class is retail merchants whether individuals, partnerships or corporations; those who sell in one store or many; those who offer but one sort of goods and those who through departments deal in many lines of merchandise. The law arbitrarily classifies these vendors for the imposition of a varying rate of taxation, solely by reference to the volume of their transactions, disregarding the absence of any reasonable relation between the chosen criterion of classification and the privilege the enjoyment of which is said to be the subject taxed. It exacts from two persons different amounts for the privilege of doing exactly similar acts because one has performed the act oftener than the other. We hold the act unconstitutional, and reverse the judgment."

Having determined that Senate Bill 724 is valid in part without reference to any allegations of the answer to support it, it follows that the alternative writ is insufficient so that the demurrer to the return must be visited back upon the writ and sustained against same.

WHITFIELD, C. J., and TERRELL, BROWN and DAVIS, J. J., concur.

BUFORD, J., dissents in part.

BUFORD, J. (dissenting in part).—I am unable to concur entirely with the views expressed in the very able opinion prepared by Circuit Judge Frank Smith sitting in place of Mr. Presiding Justice Ellis, who is not participating on account of temporary physical disability.

I concur in what is said in that opinion except insofar as it holds the provisions of "Subdivision A" of Section 4 of Chapter 16848, Acts of 1935, valid.

I think the tax imposed under Class 1 of Subdivision A, *supra,* is valid and that this can be segregated from the balance of the subdivision and held valid and applicable to all stores, although the remaining provisions of that subdivision are held void and inoperative because of being in abrogation of organic law, which I think they are. This may be done on the same authority and reasoning under and by which Judge Smith's opinion holds the provisions of Class 1 "Subdivision B" to be valid, although the remainder of that subdivision is invalid.

Under the Federal Rule a tax may be so oppressive as to destroy the subject taxed without being held invalid. Florida does not subscribe to that rule but holds to that which is, that "Excise taxes have been imposed in many ways, but, so long as they are reasonable, not unjustly discriminatory, nor arbitrary, whimsical, irrational, grossly oppressive, plainly unequal or contrary to common right, they will be upheld." State v. Allen, 83 Fla. 214, 91 Sou. 104, 26 A. L. R. 735; Jackson v. Neff, 64 Fla. 326, 60 Sou. 350, writ of error dismissed in 238 U. S. 610, 35 S. Ct. 792, 59 L. Ed. 1488; Peninsular Gas Co. v. State, 68 Fla. 411, 67 So. 165; Amos v. Gunn, 84 Fla. 285, 94 So. 615; Amos v.

Mathews, 99 Fla. 1, 65, 115, 126 So. 308; Sheip Co. v. Amos, 100 Fla. 863, 130 So. 699; Liggett Co. v. Amos, 104 Fla. 609, 141 So. 153, 157, reversed in Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 48. See Gray v. Central Fla. Lbr. Co., 104 Fla. 446, 140 So. 320, 325, 141 So. 604.

But even under the Federal Rule clearly arbitrary discriminations are held to invalidate. F. S. Royster Guano Co. v. Commonwealth of Virginia, 253 U. S. 412, 415, 64 L. Ed. 989, 990, 40 Sup. Ct. 560; Airway Electric Appliance Corp. v. Day, 266 U. S. 71, 85, 69 L. Ed. 169, 177, 45 Sup. Ct. Rep. 12; Schlosinger v. Wisconsin, 270 U. S. 230, 240, 70 L. Ed. 557, 564, 43 A. L. R. 1224, 46 Sup. Ct. Rep. 260.

To begin with, I cannot agree that the statute makes the "*Chain* of stores" the unit for the purpose of taxation. The tax laid by Section 4 of the Act is: "For the privilege of continuing in or engaging in the business of a retailer as defined in this Act, there is hereby imposed upon every person, firm, corporation, association or copartnership, trust or joint stock company, and any firm however organized or whatever be the plan or operation, shall under the terms of this Act be required to obtain a permit or license to operate a store in this State, a tax which shall be equal to the amount due under the provisions of Subdivision A, and the amount due under the provisions of Subdivision B of Section 4 of this Act;"

A retailer is defined as follows by the Act; " 'Retailer' includes every person engaged in the business of making sales at retail."

So it is clear that the tax is levied on the retailer for each store operated and the amount of the tax is determined by the class within which the retailer falls under the provisions of Subdivision A of Section 4, *supra.*

Under the terms of the Act, if John Doe operates three stores he is a retailer coming within Class 2 and is entitled to procure his license for the operation of such stores for $50.00 each per annum, beginning July 1st, as long as he remains subject only to the license tax fixed for Class 2. There is no provision for a Class 2 tax paid to be applied on a Class 3 tax. So if John Doe is inclined to and determines to open and operate a fourth store he must then procure license as a retailer operating four stores and must pay for the license for each store under the provisions of Class 3 of Section 4, *supra*, or $100.00 for each store. Therefore, he must pay $400.00 license tax for the privilege of operating the fourth store along with the original three; but he can add and operate the fifth store and sixth store, by paying an additional license of only $100.00 for each. This is true while at the same time he is now paying $100.00 for the privilege of operating his No. 1 store, his next door competitor is paying a license of $10.00 for the privilege to operate a like store as a retailer under the same legislative Act. So does the discrimination continue until we reach Class 6 and here it gets worse.

A retailer who operates 15 stores is in Class 5, with license paid to operate his 15 stores at $300.00 each. He wishes to acquire and operate one more store; to do so he must procure a license for each of his 15 stores and one for his 16th store at $400.00 each, or $6400.00. This he must pay for the privilege of operating his 15 stores in connection with his 16th store, although he may acquire and operate his seventeenth (17) (and any number of stores above that number) by paynig an additional license tax of only $400.00 each for the privilege of operating this seventeenth and each additional store in connection with the other 16 stores. He must pay a license tax of $400.00

for each of his 16 or more stores, while his competitor next door who operates only six stores is required to pay a license fee of only $100.00 on each store. The retailer operating 16 stores pays at least $6400.00 for his license, while the retailer operating six stores pays $600.00 for the privilege of operating them.

Eighteen chain stores may be operated in groups of six stores each under different management for license tax of $1800.00, while the same number of otherwise identical stores except for being under one management will be required to pay $7200.00 for licenses.

It may be said that the legislative intent was that when a license tax shall have been paid on a group of stores in one class and the retailer thereafter opens and operates additional stores which would put his stores in a higher priced bracket, he should have credit on his higher license for the cost of his original license. This may be true, but the Act is not so written, and it is not our province to rewrite it. It is just as reasonable to assume that the legislative intent was to apply the higher tax in each bracket to the stores in that bracket in excess of the stores covered by the next preceding lower bracket which would have eliminated all question of the validity of the tax. Liggett & Co. v. Lee, 288 U. S. 517, 53 Sup. Ct. Rep. 481, 85 A. L. R. 699, 77 L. Ed. 929; Fox v. Standard Oil Co., 294 U. S. 87, 79 L. Ed. 780, 55 Sup. Ct. Rep. 333. But, we can not rewrite the Act in this way and the Act as written will not warrant that construction. I think the taxes as laid in Classes 2, 3, 4, 5 and 6 in Sublivision A are clearly arbitrary and discriminatory as between retailers operating chain stores and that these provisions of the Act violate the *equal protection of the law* provisions of the State and

Federal Constitutions and that they also violate due process of law.

The language used in the Act shows on its face that it was intended to be arbitrary and discriminatory. Section 1 of the Act says in part:

"DECLARATION OF POLICY. It is hereby determined and declared that extensive new revenues are required to promote education and to preserve the common school system of the State of Florida; * * * and further, that the increasing growth of chains and the greater multiplication of units of stores tend to foster monopoly and to create unemployment by driving out of business their competitors who do not enjoy such advantages and that therefore the multiplication and extension of such units of chain stores should be discouraged as a matter of public policy."

This language indicates the intent to work a hardship under the guise of a revenue measure that would in part at least retard or destroy the subject taxed. This might be done with an Act constituting a proper police regulation in the exercise of existing police power. But, it is very properly conceded by the Attorney General that there is no proper place for the exercise of the police power in the enactment or enforcement of this Act.

The answer avers: "Some of the material points of difference between chain stores and independently owned stores operating in Florida, (are) to-wit: abundant capital, standardization in equipment and display, superior management, combination of wholesale and retail functions under one control, more rapid turnover, uniformity in store management, uniform accounting methods, a unified sales policy co-ordinating the diverse units, more current styles because of buying ability, superior and unified advertising, superior location, discounts, allowances, and re-

bates on quantity purchases, and the serving of the public in the manner in which the public desires to be served."

At another place in the answer it is alleged: "Florida consumers also buy their groceries from chain stores because of the pleasing personality of the store manager or other employees, because of the aggressive and consistent advertising of their wares on the part of the chain stores, and on account of the sanitary condition of the selling premises."

Aside from the revenue feature of the Act, its chief purpose appears to be to place such a burden on some classes of retail merchants as to make easier successful competition by other classes. How long, oh Lord, how long, will it take for us to learn that the creation of successful business acumen and practices, of good moral character and of the application to religious thoughts and habits are things far beyond the power of legislative enactments or judicial decrees, although legislative enactment in the exercise of the police power where such power is applicable may either open wide or materially obstruct the road to debauchery and immorality and in doing so leave the judiciary powerless to interfere with the condition so created. The courts have no power to either *enact* or to *repeal* or to *veto* laws. The province of the Court when the validity of a legislative enactment is legally challenged is to apply to the Act the yardstick known as the Constitution and unless it be *clearly* shown that it will *not* satisfy that measure it must be held valid, although it may license vice and disregard good morals. Even the record in this case shows that the opinion and judgment of the Supreme Court of the United States in the Stewart Dry Goods Company case was available to members of the Florida Legislature when the provisions contained in Subdivision B were put into this statute.

Therefore, the like provisions as those contained in that Subdivision in Classes 2 to 6 inclusive had then been held unconstitutional by the highest court in the nation, which fact was known, or should have been known to all well informed lawyers, and to all persons participating in such legislation. But, with this condition evident the Act was passed by the Legislature and, in the language of the street, the "buck" was passed to the courts. It must have been apparent that the net result would certainly be the fixing of a sugar-coated sales tax on all the retail merchants of Florida to the extent of one-half of one per cent. of gross cash receipts with the probability of fixing an additional arbitrary, discriminatory and *discouraging* tax burden on a very large part of those retail merchants who are shown by the answer of the Attorney General in this case to be rendering to the buying public the best of service from every standpoint.

In the case of State, *ex rel.* Lamar, v. Jacksonville Terminal Co., 41 Fla. 363, 27 Sou. 221, it was held:

"The provisions of Section 1 of Article XIV of the amendments to the Constitution of the United States, forbidding State legislation that denies to any person the equal protection of the law, does not preclude legislation reasonably classifying persons and things, and generally, it only requires the same means and methods to be applied impartially to all the constituents of a class so that the law shall operate equally and uniformly upon all persons in similar circumstances. The rest of the *reasonableness* of a classification is that it must be based upon some difference that bears a just and proper relation to attempted classification, and is not a mere arbitrary selection."

Let it be understood that I do not question the power of the Legislature to enact a valid law which establishes a

discriminatory license tax as beween "individual" stores. and "chain" stores, as long as the discrimination is not so oppressive, unequal, whimsical and arbitrary as to violate. the provisions of organic law. Nor do I question the power of the Legislature to lay a progressively increasing tax on chain stores in proportion to the benefits enjoyed by reason of the increases in units of distribution.

Here, however, we are dealing with an unreasonable, arbitrary and whimsical discrimination between different units in chain stores falling within the same class as well as between different units falling within different classes. If the addition of a store to an existing chain of six stores confers a benefit on all so that the tax on the original six must be raised, by what reasoning may it be assumed that the eighth store may be added to the so created chain of seven without the requirement of any additional tax on the seven?

I am not unmindful of the fact that a three-judge Federal Court has held the provisions of the Act here under consideration valid and that such fact, while not controlling the Supreme Court of Florida, is of persuasive value and influence. I am also cognizant of the fact that in Liggett & Co. v. Lee, 288 U. S. 517, 77 L. Ed. 929, 53 Sup. Ct. Rep. 481, 85 A. L. R., 699, the Supreme Court of the United States said: "The addition of a store to an existing chain is a privilege, and an increase of the tax on all the stores. for the privilege of expanding the chain cannot be condemned as arbitrary." The statement, however, was entirely gratuitous, as it was not at all necessary in the determination of the validity of the statute then being considered. In Fox v. Standard Oil Co., 294 U. S. 87, 79 L. Ed. 780, 55 Sup. Ct. Rep. 333, to quote from the opinion in that case, the tax was laid as follows:

"Upon one store the fee was to be $2; upon two stores

·or more, *but not to exceed five,* the fee was to be $5 for each additional store; upon *six* or more, but not *to exceed ten,* $10 for each additional store; upon each store in excess of ten but not to exceed fifteen, $20; upon each in excess of fifteen but not to exceed twenty, $30; upon each in excess ·of twenty, but not to exceed thirty, $35; upon each in ex·cess of thirty, but not to exceed fifty, $100; upon each in excess of fifty, but not to exceed seventy-five, $200; and upon each in excess of seventy-five, $250."

So the question of the validity of such a tax as is here ·sought to be imposed was not involved.

I have found no case where the questions here presented ·were directly involved, except that of J. C. Penney & Co. ·v. Diffendorf, 54 Idaho, 374, 32 Pac. (2nd) 784, and in the Act involved in that case the gross infirmities and dis·criminations did not exist as they do in the Act here under consideration.    There the increase in the tax had some re·lation to the advantages ascribed to the numerical increase in operations.

The tax there under consideration was laid as follows:

1.   Upon one store the annual license fee shall be five ·dollars for each such store;

"2.   Upon two stores the annual license fee shall be ten ·dollars for each such store;

"3.   Upon three stores the annual license fee shall be ·twenty dollars for each such store;

"4.   Upon four stores the annual license fee shall be thirty-five dollars for each such store;

"5.   Upon five stores the annual license fee shall be fifty-five dollars for each such store;

"6.   Upon six stores the annual license fee shall be ·eighty dollars for each such store;

"7. Upon seven stores the annual license fee shall be one hundred ten dollars for each such store;

"8. Upon eight stores the annual license fee shall be one hundred forty dollars for each such store;

"9. Upon nine stores the annual license fee shall be one hundred seventy dollars for each such store;

"10. Upon ten stores the annual license fee shall be two hundred dollars for each such store;

"11. Upon eleven stores the annual license fee shall be two hundred thirty dollars for each such store;

"12. Upon twelve stores the annual license fee shall be two hundred sixty dollars for each such store;

"13. Upon thirteen stores the annual license fee shall be two hundred ninety dollars for each such store;

"14. Upon fourteen stores the annual license fee shall be three hundred twenty dollars for each such store;

"15. Upon fifteen stores the annual license fee shall be three hundred fifty dollars for each such store;

"16. Upon sixteen stores the annual license fee shall be three hundred eighty dollars for each such store;

"17. Upon seventeen stores the annual license fee shall be four hundred ten dollars for each such store;

"18. Upon eighteen stores the annual license fee shall be four hundred forty dollars for each such store;

"19. Upon nineteen stores the annual license fee shall be four hundred seventy dollars for each such store;

"20. Upon each such store in excess of nineteen the annual license fee shall be five hundred dollars for each such store."

But, even so, I am not convinced that the rule stated in that case is sound law. The rule is held to be otherwise

and in harmony with the views herein expressed in City of Douglas v. South Ga. Grocery Co., 180 Ga. 519, 179 S. E. 768; Great Atlantic & Pacific Tea Co. v. Maxwell, 199 N. C. 433, 154 S. E. 838. Affirmed 284 U. S. 575, 76 L. Ed. 500, 52 Sup. Ct. Rep. 26, and authorities cited in these cases.

It appears to me to be an elementary, sound and necessary conclusion that to deny John Doe the right to operate six chain stores for the same license tax for which Richard Roe may in the same locality operate six like chain stores, although John Doe operates one or three other such chain stores for the license to operate which he must pay a reasonably higher license, is to definitely deny to John Doe the equal protection of the law in the operation of those six stores.

For the reasons stated, I think Class 1 of Subdivision A of Section 4 and Class 1 of Subdivision B of Section 4, *supra,* are valid legislative provisions and should be applied to all coming within the purview of the Act and that all other provisions of Subdivision A and of Subdivision B of Section 4 of the Act should be held void as violating Section 1 of the Declaration of Rights of the Florida Constitution and the Fourteenth Amendment to the Federal Constitution.

DAVIS, J. (concurring with FRANK A. SMITH, Circuit Judge).—In view of the objections set forth in the separate opinion of Mr. JUSTICE BUFORD, dissenting in part from the opinion of a majority of this Court in this case upholding the validity of Subdivision A of Section 4 of Chapter 16848 (Senate Bill No. 724) as a whole, instead of rejecting all parts of it except Class 1 (which by itself is admittedly a valid tax in each judge's opinion), I deem it appropriate to briefly suggest the answers to them which

in my opinion warrant a conclusion that Subdivision A in is stated form is valid.

(1) *On the point of confiscation.* It is suggested that a tax of $400.00 per annum on each separate store in the highest chain class (Class 6) is inherently oppressive and confiscatory, yet it amounts to little more than a tax of $1.00 per day on the privilege of opening an outlet for the doing of the enormous volume of business usually perceived to result from each extension of the larger chains. In Hiers v. Mitchell, 95 Fla. 345, 116 Sou. Rep. 81 (which was a special school license tax case), this Court sustained as valid the imposition of a special license tax of $120.00 per year ($10.00 per month) upon all sellers of tires and tubes doing business in the City of Tampa, as against the objection that any such enormous tax was confiscatory and a violation of both the State and Federal Constitutions. That ruling the Supreme Court of the United States has refused to disturb. See: Carter v. Burnett, 116 Fla. 699, 156 Sou. Rep. 698, 294 U. S. 697, 55 Sup. Ct. 547, 79 L. Ed. 1234. Certainly if a special $10.00 a month special school tax is constitutionally justified on a little independent automobile tire and tube dealer whose stock in trade may be worth no more than the yearly tax, a tax amounting to a little more than $1.00 per day on each store in the largest class of chains is not unwarranted for the same (public school) purpose. In this connection it is to be observed that although Chapter 12412, Acts 1927, has been in force for eight years, no special diminution in the number of available tire and tube dealers establishments in the State has been noted to have been occasioned by the continued collection of the tax, or the Legislature's refusal to repeal it. On the contrary, the tire and tube dealers have simply passed the special tax on to the public in the form of an

increased price for automobile tires and tubes sold in Florida, and thereby tourists and others who buy tires and tubes on which to travel about in this state for the enjoyment of its climate, have indirectly contributed their "bit" to the education of their children which it is the state's policy to educate free of tuition, despite non residence in the state.

(2) *On the Point of Arbitrary Classification.* Much of what has been said on this point is to "stress mere details but ignore the underlying reason for sustaining the classification * * * attacked"—a practice expressly condemned by the Supreme Court of the United States in its opinion in Liggett Co. v. Lee, 288 U. S. 517, 53 Sup. Ct. 481-484, 77 L. Ed. 929, 85 A., L. R. 699. In that case the United States Supreme Court pointedly held (text page 533) "neither similarity of opportunities and advanges in some respects, nor the fact that one kind of store competes with the other, is enough to condemn the discrimination in the taxes imposed" and that gradation of the tax according to the number of units operated cannot be said to be so unreasonable as to transcend the constitutional powers of the Legislature." In this case there is at least a "rough and ready" but honest effort to classify chains into five classes in each subdivision of Section 4 of the Act. Such classes are (a) chains of two to three stores, both inclusive; (b) chains of four to six stores, both inclusive; (c) chains of seven to ten stores, both inclusive; (d) chains of eleven to fifteen stores, both inclusive; and (e) chains of sixteen stores, or more, however great the total number thereof in the chain. Within each stated class the tax is laid uniformly on each separate store at the same amount for every store in the given class. Only by a comparison of stores in one class with the stores in an entirely different

class can any so called discrimination be made to appear. Such comparisons between individual units in different classes constitutes a mere "stressing of details," as the Supreme Court of the United States has pointed out and is not demonstrative of an arbitrary classification. On the contrary, in Liggett v. Lee, *supra,* the Federal Supreme Court expressly held, "The addition of a store to an existing chain is a privilege, and an increase of the tax on all the stores for the privilege of *expanding the chain* cannot be condemned as arbitrary" (288 U. S. text page 533). Such a deliberately phrased statement by the Supreme Court of the United States is one that cannot be lightly disregarded or casually swept aside as mere "dicta," especially in view of the fact that the Court in reviewing Liggett v. Lee, *supra,* was therein not only called upon to decide the controversy then before it on its narrowest consideration, but was plainly authorized to, and in fact did undertake to, define the scope and limits of the state's legislative power necessarily involved in the rule it was compelled to announce on that appeal in order to decide that case at all. For an appellate court to state a rule of law pertaining to a state's powers as limited by the Federal Constitution, after all, demands that the limitations and exceptions to the rule be likewise specified as an incident to its own correct enunciation, in order that misapprehension may be avoided as to what is intended to be within the scope of the major rule. The fact that the Legislature might have legitimately provided for a progressively increasing tax on the chains for each and every added store *ad infinitum* is no cause for saying that the law is unconstitutional because the Legislature did not make the taxes on each added store to a chain as burdensome and oppressive as it was authorized to make them within the limits

of its legislative power as set forth in Fox v. Standard Oil Co., 294 U. S. 87, 55 Sup. Ct. Rep. 333, 79 L. Ed. 780. The fact that a class of chain stores, consisting of a specified number of stores, could have been extended to embrace some others who have been excluded, is not necessarily proof of unjust discrimination or of denial of the equal protection of the laws. Middleton v. Texas Power & Light Co., 249 U. S. 152, 39 Sup. Ct. Rep. 227, 63 L. Ed. 527; Rosenthal v. New York, 226 U. S. 260, 33 Sup. Ct. Rep. 27, 57 L. Ed. 212; Heath & Milligan Mfg. Co. v. Worst, 207 U. S. 338, text 355, 28 Sup. Ct. Rep. 114, 52 L. Ed. 236.

(3) *The Declaration of Policy Criticised.* Whatever attempt was incorporated in Chapter 16848, *supra, to entirely destroy chain stores as such* by taxing them out of existence (in line with those parts of the Legislature's declaration of policy which are capable of being construed to that effect), is to be found to have attempted only in Subdivision B of Section 4 of the Act. It can hardly be denied that the scheduled gradation of the gross receipts privilege tax therein specified was plainly designed to make the increased volume of business usually done by chain stores a self-consuming fire of increased tax burdens in order to bring about the accomplishment of the total destruction of the chains. However, all the Judges have agreed that the attempted *gradation* incorporated in Subdivision B of Section 4 of the Act must fall insofar as it is in excess of the minimum uniform rate of one half of one per cent. prescribed for single stores by Class 1 of Subdivision B, so any declaration of policy for the destruction of the chains as such. disappears out of the case and becomes moot with the excision of Classes 2, 3, 4, 5 and 6 of Subdivision B of said Section 4.

(4) *On the Point of Equal Protection and Due Process*

*of Law.* Our Constitution provides that "All *men* are equal before the law. * * * (Section 1, Declaration of Rights) and that "No person shall be * * * deprived of life, liberty or property without due process of law. * * *" Section 12, Declaration of rights.) It also provides that "the paramount allegiance of every citizen is due to the Federal government * * * " (Section 2, Declaration of Rights.) The Federal Constitution provides that "nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws." (Section 1, Fourteenth Amendment, U. S. Constitution.)

Insofar as "equal protection of the laws" is concerned, our State Constitution contains no "equality before the law" limitation except as to "men," although such an implied limitation as to persons, natural and corporate, may be somewhat comprehended in the idea of "due process of law." Hence the only judicially recognized express constitutional requirement of "equal protection of the law" for all "persons" (meaning thereby corporations as well as individuals under the United States Supreme Court decisions*) is to be found in the Fourteenth Amendment to the Federal Constitution. The "equal protection of the laws" clause of the United States Constitution being enforceable in the State Courts, as the "Supreme Law of the Land," in accordance with Article VI, paragraph 2, of the U. S. Constitution, the Federal Court decisions are peculiarly applicable to any case in such State Courts involving an alleged denial of "equal protection of the laws" by a state legislative Act, whether the applicable Federal Court decisions are those of the Supreme Court of the United States or of the unreversed lower Federal Courts.

---

*Liggett v. Lee, *supra.*

On the point of "equal protection of the laws" under the Federal Constitution, it is pertinent to refer to the fact that the present Florida statute—Chaper 16848, Acts of 1935, now being considered in this case, was first put in litigation in the Federal Courts and the validity of Subdivision A of Section 4 of said Chapter 16848 (including its double tax feature) fully sustained therein, prior to the time this suit was filed in the Supreme Court of Florida.  See: Lane Drug Stores v. Lee, 11 Fed. Supp. 672 (decided July 29, 1935).  Therefore since we have an unappealed from and unreversed Federal stautory court decision on the precise point of law at issue in this case, which Federal Court decision is on an asserted right predicated solely on the Constitution of the United States, and the point involved in this case has been decided by the Federal Court in a case instituted long prior to this one, I think we should regard the Federal Court decision as ample authority upon which to uphold the validity of Subdivision A. of Section 4 of the Act, if we had nothing else at all to go on, at least until we have had it demonstrated that the Federal Court decision is clearly wrong as a substantive precedent.

On the point of deprivation of life, liberty and property without "due process of law" as reviewable in the State Courts, as distinguished from the Federal Courts, the rule established in our state decisions is that since "due process of law" includes due process of law in the exercise of the taxing power and is regarded as an express right secured by our State Constitution's Declaration of Rights, that the scope of judicial inquiry into the statutes in the State Courts is broader when a violation of the State's Declaration of Rights by such statutes is claimed—not that the right itself to due process of law is any different than that recognized in the Federal Courts.

The Federal Courts have no such freedom of judicial action as the State Courts of Florida have to grant relief against alleged oppressive state taxation so heavy as to amount to a designed destruction of an inherently lawful business or calling. This follows because the Federal Courts must apply to the State as a unit a negative Federal constitutional restraint against the alleged sovereign power of the State itself* as exerted in all of its departments, while, as a State Court, we are required to act judicially only against an alleged usurpation of power by the State Legislature (as one department of the State) in cases where the Legislature may have attempted to unconstitutionally destroy a citizen's right to his life, liberty, property or pursuit of happiness contrary to the spirit of the State's Declaration of Rights as expressed in the State's own Constitution.

Under the Federal doctrine as expounded in Fox v. Standard Oil Co.; 294 U. S. 87, 55 Sup. Ct. Rep, 333, 79 L. Ed. 780, the power to tax chain stores being found to exist, the character and extent of its exercise, however oppressive the specific amount of taxes imposed may be, is not subject to judicial review. But under our State Court decisions, a more liberal rule exists, as evidenced by our heretofore expressed view in City of DeLand v. Florida Public Service Co., 119 Fla. 804-819, 161 Sou. Rep. 735, 740-741, and kindred cases. We are committed to the doctrine that the state's power to impose a privilege tax cannot be so exercised in the State of Florida as to amount to the spoliation of a common calling, such as the merchandising business, under the guise of taxation, subject of course to

---

*Or power of a "quasi-sovereign" State, as Mr. Justice SUTHERLAND puts it in the case of Florida v. Mellon, 273 U. S. 12 (text page 16) ; 47 Sup. Ct. Rep. 265, 171 L. Ed. 511.

the well recognized exception that where the state is warranted in employing its police power to entirely suppress a business because of its invidious nature as one detrimental to the public welfare, it may do indirectly what it can do directly, namely, impose a prohibitive license tax on it as a means to that end.   Compare: Jackson v. O'Connell, 114 Fla. 705, 154 Sou. Rep. 697 (sustaining the validity of a municipally imposed prohibitive tax on slot machines of a gambling character) with Heriot v. City of Pensacola, 108 Fla. 480, 146 Sou. Rep. 654 (sustaining a special privilege tax on inherently lawful common callings).

I am unable to subscribe to the new legal theory being advanced to the effect that "chain stores" as such are subject to entire prohibition under the state's police power, so any tax imposed on such stores must be sustainable under the ordinary doctrine of taxation that inhibits such heavy taxation on such stores as to amount to a destruction of them by such means.

So while the Declaration of Rights entitled the parties to this case to a judicial review under the State Court decisions of the alleged oppressiveness of the tax, I find nothing in the record to support the argument that the maximum tax of $400.00 per annum per store, plus one-half of one per cent. tax on the gross receipts of each chain store in the largest class of chains, will be so inherently destructive as to amount to unconstitutional spoliation.

It was the adoption by the people of the 1934 Homestead Tax Exemption Amendment, as stated by the Governor* in his first message to the 1935 Legislators, that made some new form of taxation by the 1935 Legislature necessary to replace what revenue was lost to the schools on exempted

---

*For the Governor's message so informing the Legislature, see 1933 Senate Journal, page 6, first column.

homesteads. The tax is plainly a combination privilege tax obviously intended and designed by its authors to be passed on to the consuming public who make up the personnel of the buying public who ordinarily carry on a retail trade with the affected stores. Therefore the public, not the merchants, will consequently be forced to pay the new tax indirectly by means of increased prices inevitably to be occasioned by this form of "sugar coated" sales tax (as Mr. Justice BUFORD has characterized it), thereby compelling the buyers, not the merchants, to bear in different form the burden of *ad valorem* taxes that could otherwise have been raised solely by a direct *ad valorem* increased real and personal property tax of fifteen mills on business properties, i. e. properties devoted to purposes other than use as homesteads.

It is extremely unlikely that the retail merchants in this State will find themselves inherently any more incapable of collecting and paying such a tax as this, in the form in which it is provided to be enforced, than such business men would find themselves incapable of collecting from the public and in turn paying into the state treasury a three per cent. general sales tax for which this particular tax measure was evidently adopted by the Legislature as a substitute. Therefore the tax cannot be struck down as a confiscatory one amounting to a denial of due process of law in violation of the Bill of Rights until a clearer demonstration of its unrighteous effect is made to appear than has been demonstrated by the showing now before this Court.

The Legislature in deciding to raise a total of $10,-500,000.00 for state aid to the common schools ($4,-500,000.00 of the amount being intended to be raised by this tax alone) was put to the practical choice of upping

the state millage 15 mills in order to produce the total appropriation of $10,500,000.00, or exacting it from the taxpayers of the state through other sources, such as taxes on liquor, slot machines, retail merchants, chain stores, automobile tags and the like. The Legislature's ultimate decision to give the school their demand for a $10,500,000.00 appropriation from state revenues, which is the equivalent of a state tax levy of 35 mills ($10,500,000.00) was expressed by the Legislature in the form of laws calculated to raise that amount from the people in the form of special excise taxes, instead of ad valorem taxes, but even so, the Legislature's plan is not subject to being judicially condemned as unconstitutional, regardless of the soundness of it as a matter of legislative policy.

In City of DeLand v. Florida Public Service Co., 119 Fla. 819, 161 Sou. Rep. 735, 740, 741, a privilege tax on public utility gross receipts similar to that prescribed by Subdivision B of Section 4 of Chapter 16848, *supra,* was struck down and condemned by this Court as confiscatory, because under the terms of the ordinance imposing the tax, the utility company was expressly forbidden to raise its rates to absorb it, even though its failure to do so might result in its being compelled to continue the dedication of its property and capital to the public service and for the public benefit, without any net profit to itself and even at a possible net loss continuous and certain in character.

In the present case, no such facts exist. Part of the combination privilege tax (the opportunity privilege segment of it) is made payable in advance on a yearly basis and such tax plainly constitutes a part of the capital investment required to be made in order to launch upon a year's business wherein the invesment can be recouped in the form of profits to be realized from business done. The other seg-

ment of it (the realization privilege tax computed on the basis of one-half of one per cent. of the previous month's gross receipts) is made payable monthly in advance for the convenience of the taxpayer, and is likewise capable of being taken into account and passed on, from month to month, in the form of a "sugar coated" sales tax to be added to the price of whatever may be sold during the particular month.

According to reliable sources of information,* Florida raises annually by various forms of taxes imposed by its Legislature, the following amounts of revenue (computed as to the fiscal year 1931-1932, except as otherwise indicated) :

| | | |
|---|---|---|
| Individual Income Taxes | None | |
| Estate, Inheritance and Gift Taxes | $ 1,152,523.00 | (1935) |
| Tangible and Intangible Property | 48,497,000.00 | |
| Business Taxes: | | |
|     General (Capital Stock and Charter Taxes) | 305,712.39 | (1935) |
|     Corporation Income | None | |
|     Insurance | 771,000.00 | |
|     Utilities | 514,450.00 | (1934) |
|     Banks (Special) | None | |
|     Stock and Mortgage Transfer (Documentary Stamp in Florida) | 427,231.36 | (1935) |
|     Severance | None | |
|     Occupational and Business License | 5,374,000.00 | |
| Taxes on Motorists: | | |
|     Gasoline and Licenses | 19,770,000.00 | |

*Page 208, "Tax Systems of the World—Sixth Edition (1935," published by Tax Research Foundation.

Excise Taxes:

| | |
|---|---|
| Liquor, Wines and Beer | 374,193.00 (1934) |
| Tobacco | No special |
| Lubricating Oils | No special |
| Sales Tax | None |
| Special on Amusements | None |
| New Taxes under Chapter 16848, Acts 1935 | 4,500,000.00 |
| Poll Taxes (for schools) | 419,000.00 |
| Miscellaneous Taxes not already included in other classes | None |

A study of Florida's finance and taxation system, as reflected in the above tabulation of sources, classes and amounts of taxes raised under authority of the Legislature, will show the relative status of the new taxes provided for by Chapter 16848, Acts 1935, in the whole scheme of things, and is incorporated in this opinion as a judicial noticing by me of a factual background, no doubt well within the knowledge of the Legislature.

Viewing the controversy in all of its aspects, and in the light of the able and comprehensive briefs filed in this and companion cases, it seems to me that the opinion of Honorable Frank A. Smith, Circuit Judge, is not unsound, but is sustainable on principle as well as on the authorities he cites. I therefore concur in the holding that Subdivision A of Section 4 of Chapter 16848, Acts 1935, is valid and enforceable in its entirety. I also agree to the conclusion that Subdivision B of Section 4 of said Chapter 16848, *supra,* is invalid as a denial of the equal protection of the laws to stores in classes 2, 3, 4, 5 and 6 of that Subdivision, and that to the *extent of the excess* comprehended in the attempted *gradation upward* of the specified tax beyond the

one-half of one per cent. on gross receipts specified for Class 1 stores in said Subdivision B that the tax in that subdivision is constitutionally unenforceable *to the extent of such excess only,* but that the Act should be enforced in all respects except as to the attempted progressive increase in the amount of the rate beyond the amount applicable to Class 1 stores in Subdivision B of Section 4 above mentioned.

BROWN, J. (concurring specially).—All members of the court are agreed that a gross receipts tax cannot, under the Constitution, be graduated in the manner attempted by Subdivision B of Section 4 of the Act here under review. That the tax imposed by Subdivision B is, in substance and effect, a tax on gross receipts is clear, and the only part of that subdivision which can possibly be upheld is "Class 1," imposing a tax of one-half of one per cent., which, by the elimination of the other enumerated classes, makes possible a construction allowing a uniform application of a gross receipts tax of one-half of one per cent. on the gross receipts of each and every store, regardless of the character of the ownership or management. This construction takes some liberties with the general scheme set up by the Act, but is deemed by the court to be justified by the very broad and unusually comprehensive language of the saving clause embodied in the Act and quoted in Judge Smith's opinion.

Frankly, I have some doubt as to the constitutionality, under our Florida Constitution, of the provisions contained in Subdivision A of Section 4 of the Act, not only for the reasons advanced by Mr. Justice BUFORD in his dissenting opinion in this case, but also for the reasons set forth in my dissenting opinion in the case of Liggett Co. v. Amos, 104 Fla. 609, 647, 141 So. 153, 167, 172, which was concurred in by Mr. Justice ELLIS. But my views in that case

were overruled by the majority of the court, not so much in regard to he principles enunciated as in regard to the application of those principles to the Act of 1931 then under review in the light of the facts pleaded, as well as those of which the court took judicial notice. And the majority view and holding of this court, in that case, involving the fundamental question of legislative power now before us, was in the main upheld and affirmed by the federal Supreme Court (See Liggett Co. v. Lee, 288 U. S. 517, 53 Sup. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699), while the conclusions in my dissenting opinion were sustained only as concerned one feature of the 1931 Act, that is, that portion of the Act then under review which imposed a greater tax per store on all stores in a chain if any one or more of the stores were located in another county or counties.

In view of the precedents set by the opinion and decision of this Court in the Liggett case, as well as the opinion and decision of the national Supreme Court, in the same case, also in view of the very broad and liberal language of the latter court in subsequent cases, notably the Fox case concerning the classification power of the Legislature, in the imposition of excise taxes, I am not able to confidently affirm that Subdivision A of Section 4 of the 1935 Act is unconstitutional and void beyond all reasonable doubt, and while I yet entertain some doubt of the constitutionality of that important part of the Act, I feel that I should resolve such doubt in favor of the action of the Legislative branch of our State government, the rule in this jurisdiction being that the courts should never strike down an Act of the Legislature unless it is unconstitutional beyond all reasonable doubt.