73 So.2d 884 (1954)
VOLUSIA COUNTY KENNEL CLUB, Inc., et al.
v.
HAGGARD et al.
Supreme Court of Florida. En Banc.
June 1, 1954.
Rehearing Denied July 6, 1954.
*885 Loftin, Anderson, Scott, McCarthy & Preston, Robert H. Anderson and D.P.S. Paul, Miami, for appellants.
Richard E. Ervin, Atty. Gen., Fred M. Burns and George E. Owen, Asst. Attys. Gen., John D. Moriarty, Sp. Asst. Atty. Gen., and Walter E. Dence, Miami, for appellees.
MATHEWS, Justice.
This case involves the legality of an additional tax upon the operator's permissible "take" from legalized gambling at dog racing tracks based upon a new or additional classification.
Chapter 28058, Laws of 1953, F.S.A. § 550.16, appears to provide an additional classification within a classification of another classification for the sole purpose of imposing an additional tax, based upon the amount of daily gross receipts for each of the new classifications.
Prior to 1931 all gambling was illegal. In 1931, F.S.A. § 550.01 et seq., the Legislature classified gambling into two classes; first, gambling at enclosed race tracks was purified and washed clean of its sin by legislative enactment, and second, gambling on races outside of an enclosure, and all other gambling still remained sinful and clothed with a noxious odor. Then the Legislature further classified race track gambling into two classes, dog tracks and horse tracks, and based upon this classification, different taxes were imposed. In 1953 the Legislature made a further classification of dog tracks for taxation or revenue purposes, and it is upon this classification an additional graduated tax is now imposed.
The new classification for dog tracks is based upon the amount of the daily gross receipts or daily pool and a different rate of taxation is imposed upon each pool according to size or amount.
The appellants contend that they are now engaged in lawful businesses and are entitled to the protection of the Constitution to the same extent as any other lawful business and that the additional tax based upon the new classification between dog tracks denies to them the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution and the Declaration of Rights of the Constitution of the State of Florida.
Sixty percent of the new tax is to be divided equally between the sixty-seven counties and forty percent is to be used for Old Age Assistance. It is urged that the tax should be upheld because it serves a useful purpose. In oral argument, particular emphasis was placed upon the fact that forty percent of the tax would be used where it was so badly needed for Old Age Assistance. No one questions the fact that the proceeds of the tax would be used for a needful purpose and that assistance to the aged has a particular appeal. Money could hardly be put to a more useful purpose than Old Age Assistance.
Only a few months ago we were urged to ignore sound principles of taxation and plain language of the Legislature in order that race tracks might run additional days because the money would be used for a useful purpose in providing college football scholarships.
Recently it was proposed to the Legislature that certain types of gambling should be legalized if the gambling was conducted by some church and such church received a part of the proceeds of the gambling. Public officials are constantly asked to look the other way at gambling at fairs and expositions. Recently there was a proposal that gambling at jai alai frontons be ignored on Sundays because *886 a part of the proceeds would go to a cancer society. Such proposals are made from time to time because it is said a part of the proceeds of the operation will be used for a good purpose. Even a good purpose must be accomplished in a lawful manner and it would be a dangerous doctrine to say that the government may or should ignore fundamental principles of the Constitution and the laws in order to accomplish a good purpose.
It is also urged that the tax should be sustained because it is a tax in the exercise of the police power to further regulate a business with a noxious odor, although legal.
This Court has held that race track gambling establishments are now legal and that those in a like situation should be treated fairly and impartially. State ex rel. West Flagler Amusement Co. v. Rose, 122 Fla. 227, 165 So. 60; Hialeah Race Course Inc., v. Gulfstream Park Racing Association, Fla., 37 So.2d 692; and Simmons v. Hanton, Fla., 65 So.2d 42. All doubt with reference to the legality of these enterprises was removed by the adoption of Section 15, Article IX of the State Constitution, F.S.A., whereby the fundamental law recognized the operation of pari-mutuel pools as being legal. As further evidence of the legislative intent to eliminate the odor theretofore surrounding the operation of race track gambling and to recognize the importance of such businesses it declared that the same "is a substantial business compatible to the best interests of the state and the taxes derived therefrom constitute an integral part of the tax structures of the state and counties. * * * and development of this business and influences and affects the financial stability of the state and counties." F.S. § 550.081, F.S.A.
At the time of the new and additional classification upon which the new and additional tax is based, there was no suggestion nor thought of additional regulation of the dog race track business. In his message to the Legislature the Governor (Journal of the House of Representatives, April 7, 1953, page 11) discussed dog tracks and said:
"* * * These businesses are not now paying a fair share of the cost of government.

* * * * * *
"I recommend that a Bill be passed for a graduated tax scale that will increase the state's `take' * * *."
The law making the new classification for the purpose of the additional tax does not contain any word or suggestion with reference to further regulation of the business of race track gambling, either in the title or body of the Act.
There may have been a time when all money from gambling was considered "tainted" money, but now the only complaint about money from legalized race tracks appears to be "taint enough of it".
In deciding this case we must, therefore, eliminate from consideration any theory that the tax is imposed under the police power for the purpose of regulation and conclude that it is a tax question and its legality must be measured by the fundamental principles with reference to taxation for revenue and that the principles of law with reference to police power and regulation are not involved.
If it is an income tax, it violates Section 11, Article IX of the State Constitution. It is not an income tax. The lower Court held: "The tax here under consideration is a tax upon a privilege." It further held that the amount of the tax was based upon the amount of the gross income based upon the different classifications, that the tax was levied upon each "`daily pool' and the tax as regards each single daily pool is assessed as a tax upon a single taxable transaction." The Chancellor further found an indication that there is a reasonable basis for the Legislature to determine that there is a definite relationship between the size of the daily pools operated by the various tracks and the profits made by such tracks and then held: "The making of such Legislative *887 determination, when justified by the facts, will be presumed for the purpose of sustaining the constitutionality of a Legislative enactment." We find no legislative determination of anything except the desire to get more money from the race tracks. There is no legislative determination that there is any difference in the various classifications except the size of the gross daily income.
A mere examination of the formula set forth in Chapter 28058, Laws of Florida 1953, as a basis of the tax shows that it is nothing more than an additional graduated tax against race tracks in the higher brackets and they are compelled to pay larger sums than the smaller tracks simply because of larger gross receipts. The transactions in the smaller and larger tracks are identical.
The appellants contend that the case of Stewart Dry Goods Company v. Lewis, 1935, 294 U.S. 550, 55 S.Ct. 525, 529, 79 L.Ed. 1054, and other similar cases are controlling in this case. The Stewart case appears to be the leading case on the subject. In that case Mr. Justice Roberts (U.S. Supreme Court) said: "We think the graduated rates imposed were not intended to bear any relation to net profits."
In the present case, the Chancellor, in his final decree, stated:
"The contention that the equal protection clause is violated is based largely upon the decision of the Supreme Court of the United States in the case of Stewart Dry Goods Company v. Lewis, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054. That case involved a tax upon the gross sales of all retail stores based upon a fixed percentage of the amount of sales in each of several brackets specified in the law, the tax being a larger percentage of the gross sales in each higher bracket as the volume of sales increased. Emphasis is laid upon the summary of the holding of the court found in the dissenting opinion of Mr. Justice Cardozo, who said:
"`The prevailing opinion commits the court to a holding that a tax upon gross sales, if laid upon a graduated basis, is always and inevitably a denial of the equal protection of the laws, no matter how slight the gradient or moderate the tax.'"
The Stewart case was followed by the case of Valentine v. Great Atlantic & Pacific Tea Co., 1936, 299 U.S. 32, 57 S.Ct. 56, 81 L.Ed. 22. That case involved tax on certain types of retail stores based upon an accumulated graduated scale. The Valentine case was first heard by a three-judge District Court, Great Atlantic & Pacific Tea Co. v. Valentine, 12 F. Supp. 760, 765, in which it was said:
"In these particulars the cases are different, but we are unable to say that such differences permit the escape of a similar condemnation as being arbitrary and discriminatory under the pronouncements in the Stewart Case. The additional and higher brackets with corresponding increase in the gross sales tax in the Iowa statute make the discrimination more apparent. The limitation in the classification to the taxation of chain stores only could not change the nature of the tax, and this would be true, giving consideration to the distinctive business species of the chain stores and all economic and welfare questions which are brought about by their advantages in making sales. Such questions might well bear on the propriety of the classification, but not on what constitutes the form or nature of a tax.

* * * * * *
"In section 4(b) of the Iowa statute we find the tax determined on a basis of the amount of gross sales of merchandise on an accumulative graduated scale and at a fixed rate on each such classification. It thereby becomes indirectly a tax upon each sale and results in an exaction of taxes in the larger graduated class in a greater amount and proportion than those exacted from a business doing the same thing where the amount of the gross sales is smaller. For instance, a merchant in the first class under section 4(b) doing a business of $50,000 a year would pay a tax of 1/20 of 1 per cent. on each dollar of goods sold; the eighth class chain store doing a business of $500,000 would pay a tax of 14/20 *888 of 1 per cent. on each dollar; the chain store in the last class doing a business of more than $9,000,000 would pay a tax of approximately 120/20 of 1 per cent., or 6 per cent., on each dollar of goods sold, and 120 times the rate provided for the gross sales in the smallest classification."
The essence of the Stewart Dry Goods decision is that the amount of the tax must bear a reasonable relation to the value of the thing taxed. If the tax is deemed a license tax, it must bear a reasonable relation to the value of the privilege obtained in return. If it is a gross receipts tax, it must bear a reasonable relation to the value of the gross receipts.
Typical computations of the taxes operation are as follows:

Amount of daily pool Tax rate Total commission Tax Net comm.
 $ 50,000. 5% $ 8,500.00 $ 2,500.00 $ 6,000.00
 50,001. $2500 & 8% 8,500.17 2,500.08 6,000.09
 75,000. same 12,750.00 4,500.00 8,250.00
 75,001. $4500 & 9% 12,750.17 4,500.09 8,250.08
 100,000. same 17,000.00 6,750.00 10,250.00
 100,001. $6750 & 10% 17,000.17 6,750.10 10,250.07
 125,000. same 21,250.00 9,250.00 12,000.00
 125,001. $9250 & 11% 21,250.17 9,250.11 12,000.06
 150,000. same 25,500.00 12,000.00 13,500.00
 150,001. $12,000 & 12% 25,500.17 12,000.12 13,500.05
 200,000. same 34,000.00 18,000.00 16,000.00

The question here to determine is whether the collection of $8,500 gross receipts out of a $50,000 pool may be taxed $2,500; whether the collection of $17,000 gross receipts out of a $100,000 pool may be taxed $6,750; whether the collection of $34,000 gross receipts out of a $200,000 pool may be taxed $18,000; and whether each status bears a reasonable relation to the others.
This Court applied the holdings of the United States Supreme Court in the Stewart and Valentine cases in the cases of State ex rel. Lane Drug Stores v. Simpson, 122 Fla. 582, 166 So. 227; State ex rel. Adams v. Lee, 122 Fla. 639, 166 So. 249; Chavers v. Harrell, 122 Fla. 669, 166 So. 261. In the case of State ex rel. Lane Drug Stores v. Simpson, supra, two taxes were sought to be imposed. The first was a graduated license tax based on the number of stores in the chain, and the second was based on gross receipts graduated according to the number of stores in the chain. In an opinion by Associate Justice Frank A. Smith, this Court upheld a graduated license tax based on the number of stores in the chain as having a reasonable basis in the advantages of multi-store operation. The second tax based on gross receipts graduated according to the number of stores in the chain was held invalid as denying equal protection of the laws. In the opinion it was held [122 Fla. 582, 166 So. 236]:
"Under subdivision A the store or chain of stores pays for the privilege of enlarging or continuing in business and there is no unjust discrimination as between the different classes. Under class 1 of subdivision B, all stores are treated alike, so that none can complain, for each store or each store in a chain of stores must pay identically the same rate of tax. However, under the different classes of subdivision B we find that the chain store would not merely be paying for a privilege of greater opportunity which it has already obtained by complying with the law and paying the flat tax applicable to its classification, but it is being charged also according to, if not for, what it has collected during the preceding month without any logical relationship between the amount of its collections (receipts) and a commensurately enhanced opportunity to be enjoyed in the new month. We see no logical reason for saying that A should pay a higher tax because he has sold and collected for an article of merchandise a certain price than B should pay for selling and collecting for *889 the same article at the same price, simply because B had a greater number of stores and had collected more money during the previous month."
In the case of State ex rel. Adams v. Lee, supra, the same result was reached in an opinion of this Court, written by Mr. Justice Davis, [122 Fla. 639, 166 So. 258] when he said:
"* * * The `realization' privilege, when contrived to be burdened with a license tax measured solely by the gross sales or gross receipts realized in the course of exercise of the taxable privilege, so proposed to be charged for as a means of raising revenue, is in its nature variable solely and only according to the amount of the realization, and not by the nature or quality of the instrumentality of realization. * * * To put it another way, the privilege of enjoyment (or realization) is the same as to each dollar realized, whether the realization be from a single place of business or from a group of business places considered in the aggregate. A privilege tax measured by the amount of gross receipts realized in the conduct of a business during a specified period of computation, if classified as is done in subdivision B for the imposition of a varying rate of taxation solely predicated upon the character of business by which the same given amount of gross receipts might be realized, would inherently so operate as to exact from two persons, enjoying exactly the same privilege, different amounts for doing exactly similar acts merely because the one has adopted one method of exercising the privilege while the other has chosen a different method."
In a Special Concurring Opinion in the Simpson case, Mr. Justice Brown said:
"All members of the court are agreed that a gross receipts tax cannot, under the Constitution, be graduated in the manner attempted by subdivision B of section 4 of the act here under review. * * *"
It, therefore, appears that the doctrine established by the Supreme Court of the United States in the Stewart and Valentine cases has been strictly followed in Florida and is the controlling law in Florida on the subject now under consideration.
In the case of State ex rel. Cole v. Keller, 129 Fla. 276, 176 So. 176, in an opinion by Mr. Justice Terrell, a tax levied by the City of Tampa upon the graduated gross income of attorneys at law was held to be invalid. See also City of DeLand v. Florida Public Service Company, 119 Fla. 804, 161 So. 735.
One main difference in the Stewart case and the case now before the Court is that in the Stewart case the graduated gross receipts tax was on an annual basis while in this case the graduated gross receipts tax is on a daily basis. The fact of discrimination is the same but is probably greater when the tax is figured on a daily basis rather than an annual basis.
It should be borne in mind that the total amount which the track may take from the daily pool is 17¢ on the dollar of the gross. From that 17¢ the State, prior to 1953, exacted 5¢, leaving the track 12¢ on the dollar to pay all losses, expenses and for profits. The additional tax imposed in 1953 was upon several different classifications based upon the size of the daily gross receipts for the new classifications. The size of the gross daily take is based upon many features such as the number of people who attend and the amounts they bet, weather conditions, the attractiveness of the track, the advertising which may be done at the expense of the track, the class of dogs racing at the track which is largely determined by the purses offered at the expense of the track. It is naturally concluded that the amount of money the track spends in sales promotion will have a direct bearing and influence upon the amount of the gross receipts making up the daily pool. The daily pool is made up from all of the bets of all of the people who attend the track that day and it makes no difference whether each bet is taxed or the sum total of the bets is taxed, the result is the same. The sole basis for the increased tax on the different pools of the different tracks in the different classifications is the size of the pool.
*890 In his final decree the Chancellor stated:
"* * * the tax is imposed upon the track operator for the privilege, not of selling individual chances, but of conducting the pool, regarding the operation of the pool as a single taxable transaction, * * *".
The Chancellor overlooked the fact that the flat tax paid by the operator gave him the privilege of selling individual chances and of conducting a pool. The tax involved is an additional tax upon additional classifications based upon the amount of the daily pool and with a different rate of taxation for each such classification. There could be no daily pool without the sale of individual chances. The number of individual chances and the amounts bet determines the gross daily receipts and the daily pool.
The additional tax imposed based upon the new classifications determined solely by the size of the daily gross receipts is a gross receipts tax. The classifications are for tax or revenue purposes and such classifications are not based upon any substantial difference between the various classes established but appear to be purely arbitrary and capricious. The effect of the attempted imposition of the tax is a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States and the Declaration of Rights of the Constitution of the State of Florida.
Reversed.
ROBERTS, C.J., SEBRING, J., and LEWIS, Associate Justice, concur.
TERRELL, THOMAS and DREW, JJ., dissent.
TERRELL, Justice (dissenting).
Pursuant to much generalizing the majority opinion comes up with the conclusion that:
"The additional tax imposed based upon the new classifications determined solely by the size of the daily gross receipts is a gross receipts tax. The classifications are for tax or revenue purposes and such classifications are not based upon any substantial difference between the various classes established but appear to be purely arbitrary and capricious. The effect of the attempted imposition of the tax is a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States and the Declaration of Rights of the Constitution of the State of Florida."
Stewart Dry Goods Co. v. Lewis, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed 1054 and Valentine v. Great Atlantic & Pacific Tea Co., 299 U.S. 32, 57 S.Ct. 56, 81 L.Ed. 22, are relied on to support this conclusion.
If we were dealing with a license tax on retail stores measured by gross sales graduated by dollar volume, there would be merit to this pronouncement, but here we are not confronted with a tax on retail stores, we are confronted with an act which continues the present tax on daily parimutuel pools and imposes an additional graduated tax on the permit holders of dog racing tracks measured by the following formula:

Total Pari-Mutuel Pool Dog Track Pari-Mutuel Pool Tax
Exceed $50,000.00 but do not exceed $2,500.00 plus 8% of excess over
 $75,000.00 $50,000.00
Exceed $75,000.00 but do not exceed $4,500.00 plus 9% of excess over
 $100,000.00 $75,000.00
Exceed $100,000.00 but do not exceed $6,750.00 plus 10% of excess over
 $125,000.00 $100,000.00
Exceed $125,000.00 but do not exceed $9,250.00 plus 11% of excess over
 $150,000.00 $125,000.00
Exceed $150,000.00 $12,000.00 plus 12% of excess over
 $150,000.00

*891 In the Stewart Dry Goods case the Court was confronted with a Kentucky statute which imposed a tax on gross sales (each higher bracket bearing a larger percentage of gross sales) of retail stores predicated on a fixed percentage of sales under the following formula:

Annual Gross Sales Amount of Tax
$400,000 or less 1/20 of 1%
$400,000-$500,000 2/20 of 1%
$500,000-$600,000 5/20 of 1%
$600,000-$700,000 8/20 of 1%
$700,000-$800,000 11/20 of 1%
$800,000-$900,000 14/20 of 1%
$900,000-$1,000,000 17/20 of 1%
In excess of $1,000,000 1%

Examination of the quoted formulas for imposing the gross receipts tax on retail stores and the daily pari-mutuel pool derived from dog racing tracks reveals a wide variance between the incidence and theory on which the two taxes are imposed. The purpose of the two taxes was common in that they stimulated the exchequer but otherwise they had little if anything in common.
The gross sales tax on retail stores was stricken down because the classification of gross sales graduated by dollar volume was arbitrary and unreasonable and violated the equal protection clause of the Federal Constitution, Amend. 14. The purpose of the tax was to equalize the tax burden as it applied to large and small merchants. Whether the merchant was large or small he was engaged in an essential business, one necessary to the economy, convenience and welfare of the people. In the Valentine case the Iowa tax was a flat amount on a cumulative graduated scale and was limited to gross sales of chain stores. The discrimination inheres in the fact that the tax was limited to chain stores and other large businesses to the exclusion of small proprietors engaged in the same kind of business.
No such philosophy prompted the tax assaulted in this case. In the first place a dog track is a luxury or pleasure business, it is not essential to the economy and welfare of the public. While it has the same legal status as the retail business and the taxes derived from it "constitute an integral part of the tax structure of the state and counties," it is nevertheless a gaming enterprise over which the state may exercise a greater and more arbitrary control, in the public interest, through both the police and the taxing power. Hialeah Race Course, Inc., v. Gulf-Stream Park Racing Ass'n, Inc., Fla., 37 So.2d 692. The rule of fairness and equality contemplated in State ex rel. West Flagler Amusement Co. v. Rose, 122 Fla. 227, 165 So. 60, applies to operators of dog tracks but it functions on a different level and is controlled by different precepts. Examination of the formula quoted herein discloses the difference in rule and gradient on which the taxing scheme works. It will be readily seen from the act and the formula that the tax in this case was designed (1) to stimulate the exchequer, (2) to place dog tracks on parity with horse tracks based on investment and other factors, (3) impose a check on size, affluence and influence by the exercise of State power. In other words the daily pari-mutuel tax works on the same principle as the personal income tax, as the gradient rises the tax increases and the State's take increases in volume.
Since the tax has to do with a seasonable gaming device which the legislature may suppress or permit within its discretion, certainly it can prescribe the formula on which the tax is imposed, the only requirement being that all tracks in the same class be treated alike. One purpose of the tax was to curb "bigness" of the type which the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note, condemned as vicious. To admit that the legislature may permit gambling on dog tracks and in the same breath contend that it cannot impose a tax sufficient to control or keep them within bounds is contrary to all reason and experience. It is contrary to every principle on which democratic government is administered.
There is nothing in the Valentine case, the Stewart Dry Goods case or any case decided by this Court that condemns a tax imposed in this manner. It is well known that the group taxed does business in substantially the same manner under like restrictions *892 at the pleasure of the State, that the group taxed is 14 dog racing tracks and the chancellor found that the ratio of net profits to the gross daily pari-mutuel pool before Federal taxes were removed was substantially equal. Appellants in effect contend that substantially equal as applied to group classification has reference to an "ironclad rule of identical equality according to a precise mathematical formula" but the answer to that contention is that no such plan of taxation has yet been devised. Whether the tax pattern is by straight fee, percentage of the take, or graduated gross of the daily pari-mutuel pool is not material, some hardships and irregularities will arise but they may not amount to invalidity. The mere fact of being unjust or oppressive as to some, may not be ground for judicial interference. Metropolis Theater Company v. City of Chicago, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730.
In Pacific American Fisheries v. Territory of Alaska, 269 U.S. 269, 46 S.Ct. 110, 70 L.Ed. 270, the court unanimously upheld a tax on fish canneries by rates graduated according to the size of the pack. The showing on which the decision rested being that account of fixed overhead costs and fluctuations in the size of the yearly catch, larger packs meant greater profits. By the same analogy a larger pari-mutuel pool as to dog tracks would mean a larger profit than it would based on the size of the salmon pack. Such a comparison or relationship of profits to gross receipts is not precluded under the Stewart Dry Goods case. The relationship of net profits to gross receipts is expressly approved in the Pacific American Fisheries case and the Stewart Dry Goods case.
Another factor which I think controlling, is that there is not the slightest analogy between the cases on which the tax here is grounded and that on which the tax in the Stewart Dry Goods case was grounded. In the latter case the gross sales tax was imposed on retail stores throughout the state while the class taxed in this case is fourteen dog racing tracks located at specific spots over the state. Permits to operate them are granted by the State Racing Commission but one track cannot now be established closer than 100 miles to another and wherever established they must be approved by the electorate of the county. Daily pari-mutuel pools are conducted within the track enclosure, every person entering the enclosure, except employees is required to secure a ticket on which an admission charge is imposed. Daily pari-mutuel pools are conducted on each race from which the track deducts 17% of the money wagered. The law fixes the number of racing days and the length of the racing season which is limited to 120 days. The track under the previous law was required to pay the state 5 of the 17% it deducts from each race's pari-mutuel pool. Requisite physical equipment, contracts with Kennels to enter dogs for the races, sufficient betting audience and other requirements essential to the success of a track, we do not attempt to detail.
Such is the condition that Chapter 28058, Acts of 1953, F.S.A. § 550.16, imposing the tax under attack, was proposed to meet. The majority opinion says there was "no legislative determination of anything except the desire to get more money from the race tracks." The record shows however, that the legislature was confronted with the Governor's message recommending the tax and calling their attention to the fact that the dog tracks were not paying their share of the tax load in return for the privilege they enjoy. The Governor's recommendation was in effect an effort to redeem his campaign pledge to the people, which the legislature effectuated by the act under assault. It would therefore seem that the legislature and the people were on notice that the tax was in the cards, and what the people know, the court is presumed to know, even though a majority of it admit they failed to find it.
In view of this background it does seem ridiculous to contend that the tax in question was for revenue only, that regulations and the police power were not involved, and that there was no legislative determination except to get "more money from the race tracks." It is a matter of common knowledge that when the racing season is on, *893 policing the track areas requires that the police force be very materially enlarged. It is such an attractive bonanza to some that they look forward to it from year to year. Who ever heard of the police force being enlarged when a new retail store was established in the community? It is a fact and the record shows, that the track with the largest daily pari-mutuel pool shows the largest profit and the track with the smallest daily pari-mutuel pool showed the smallest profit. The size of the annual total of pari-mutuel pools of the other tracks do not depart materially from this pattern. The allocation of racing dates and other factors have caused slight departures, but they are not so material as to remove the case from the rule
For the foregoing reasons I think there is a perfectly rational basis for the legislative determination that the pari-mutuel daily pool is a single taxable transaction and being so, the Stewart Dry Goods case does not control. In fact, I do not think it has any more influence on this case than the Dartmouth College case. [Trustees of Dartmouth College v. Woodward, 4 Wheat 518, 4 L.Ed. 629.] We are dealing with a gaming enterprise that the legislature had plenary power to prescribe the formula on which to tax it. This is true because, as pointed out herein, the essentials and the incidence of the daily pari-mutuel pools are so different from those of a retail store there is no common ground by which a tax on both could be imposed by the same formula. The rules that govern retail stores and those that govern the conduct of daily pari-mutuel pools have about as much in common as the rules that govern a poker club and those that govern a Sunday school. We are not confronted with an income tax. We are concerned solely with a tax on a privilege imposed by a formula devised by the legislature. It was designed to require the dog track owner to pay his share of the burden for the privilege he enjoys. Measured by class every track owner is treated alike. The tax is no more arbitrary than the income tax, the gasoline tax and other tax impositions.
Brush aside the phony halo that beclouds this case and phrase it so that "he who runs may read," it is simple  we have fourteen dog tracks in Florida that enjoy their franchise by grace of the legislature which could abolish them at will. They were provided for the pleasure of those who have gaming blood in their veins, they operate 120 days during the year as directed by the State Racing Commission. The chancellor found that the formula by which the legislature saw fit to hike their taxes treated all of them substantially equal. The tax was proposed on the theory that the dog tracks were not paying their part of the tax burden, it was an equalization measure, the legislature proceeded on the Governor's recommendation and if ever an objective was accomplished in democratic fashion, this one was.
It could have appropriately been upheld on authority of Pacific American Fisheries v. Territory of Alaska, supra, or better on the theory that the regulation was one of pure legislative discretion like raising one's gas tax, tag tax or income tax. Tested by inductive syllogism  if the legislature can require every automobile owner to pay eight cents taxes on every gallon of gas when he was formerly required to pay two cents, or if one can be required to pay $20.00 for automobile tag, for which he once paid ten dollars and if Congress can hike one's income taxes so that it takes practically one-half what he makes to pay them, if he is in one of the upper brackets, it does not make sense to say that the legislature cannot prescribe a formula for hiking the tax on dog racing tracks. Since when did dog tracks become immunized from additional taxes? No one else is, and I can find nothing in the majority opinion that immunizes them except the fallacy that the Stewart Dry Goods case control. The legislature provided a new and different formula for taxing dog tracks and the majority opinion points out no error in that formula but finds the Act bad on the basis of a different formula.
It is a serious matter to strike down an act of the legislature and it should never be *894 done if there is any logical basis on which it can be upheld. Every presumption must be indulged in favor of its validity. Even when a court is confronted with two theories, one to uphold and one to strike it down, it is its duty to adopt that which will uphold the act. None of these presumptions have to be invoked in this case, being a gaming device the legislature can not only limit it to a short season, it can further restrict it by a tax formula in order that it may not become more powerful than its creator.
I therefore dissent and am authorized to say that THOMAS and DREW, JJ., concur in this dissent.
THOMAS and DREW, JJ., concur.

On Petition for Rehearing
MATHEWS, Justice.
A "Petition for Rehearing" has been filed in this case. It contains 13 pages consisting of 10 grounds divided into subdivisions. Each ground is preceded by an allegation that the Court "overlooked and failed to consider" some particular question or theory which is then pointed out. A comparison of the petition with the opinion emphasizes the fact that the specific questions or theories which it is alleged the Court overlooked and failed to consider were not overlooked; that the Court did consider, discuss and pass upon each of the questions or theories presented. The petition simply takes issue with the Court on the rulings and conclusions of the Court and amounts to a re-argument of the case without the permission of the Court.
This Court has repeatedly pointed out that violations of 30 F.S.A. Supreme Court Rule 25(b), with reference to petitions for rehearing, may cause such applications to be dismissed. We have said that among such violations are: (1) to include in the petition a written argument and citation of authorities; (2) to join issue with the Court as to the correctness of its conclusions upon points involved in its decision that were expressly considered and passed upon; and (3) to re-argue the cause in the application in advance of a permit from the Court for such rehearing. Hull v. Burr, 58 Fla. 432, 50 So. 754; Texas Co. v. Davidson, 76 Fla. 475, 478, 80 So. 558; Payne v. Ivey, 83 Fla. 436, 93 So. 143; Atlantic Coast Line R. Co. v. City of Lakeland, 94 Fla. 347, 115 So. 669. Notwithstanding the violation of the rules that is apparent upon the face of the petition before us, we will, in the exercise of our discretion, consider the petition and discuss the grounds raised.
We have noted the statement in the petition for rehearing that our opinion "strangely indicates that the Legislature is powerless to change the tax rate on dog tracks because of the flat tax". There is nothing in the opinion to justify such a statement or conclusion. There are many able men in each branch of the Legislature with sufficient ability and understanding to draft a law to increase the tax on dog tracks without doing violence to the Constitutions of the United States and the State of Florida.
In ground 1 of the petition for rehearing it is stated that the Court "overlooked or failed to consider" that the tax imposed is an excise tax or license tax for the exercise of the privilege of doing business and that the tax bears a direct relationship to the value of the privilege for which the license tax is enacted. The petition throughout argues that the Court overlooked the fact that there was a legislative finding or determination of a relationship between the size of the pools conducted by the various tracks and the profits made by such tracks.
We did not overlook these questions but discussed, considered and passed upon them. We assumed that everyone was familiar with the provisions of Section 11, Article IX of the State Constitution, F.S.A., which prohibits taxes upon income in this state, and considered it unnecessary to discuss the questions at length. This amendment to the Constitution was originally adopted at the General Election of 1924 when it *895 was approved by an overwhelming majority of the electors.
It is noteworthy that the attempt of the Federal Government to levy an income tax was declared illegal and unconstitutional by the Supreme Court of the United States, and it required a special amendment to the Constitution of the United States granting such power to the Congress before such a tax could be imposed and upheld. Thereafter, the people of Florida overwhelmingly approved a special amendment to the Florida Constitution prohibiting the imposition of such a tax in this state.
It was clearly held in the opinion to which the petition for rehearing is addressed that the tax in question was not an income tax, and that if the Legislature intended it as an income tax, the statute would be a direct violation of Section 11, Article IX of the State Constitution. If there had been a legislative determination of the relationship between the size of the pools conducted by the operators at the various tracks and the profits made by such tracks, then the proposed tax would have been an income tax and prohibited by Section 11, Article IX, State Constitution. We then proceeded to quote the statement of the lower Court, that "the tax here under consideration is a tax upon a privilege". It should, therefore, be apparent and obvious that we did not overlook the fact that the tax in question was an attempted imposition of a tax upon a privilege, or that it was contended that the tax bore a direct relationship to the value of the privilege for which the license tax is enacted. We held, however, that it appeared from the Act itself that there was no legislative determination of any relationship between the size of the pools operated by the various tracks and the profits made by such tracks, and that there was no legislative determination of anything except a desire to get more money from the tracks. The classification, based solely on gross receipts, and the inequalities, were considered and pointed out. It should be clear from the opinion that we did not overlook the questions mentioned in the petition for rehearing but actually discussed and passed upon them, and the law of the case was settled so far as these questions were concerned.
We did not discuss income tax cases for the obvious reason that such a tax in this state is prohibited by a special constitutional amendment, and such cases have no application in this case. Neither did we consider or discuss inheritance tax cases because they are of no importance in applying the principles of taxation controlling this case. To say the least, the inheritance tax is not a tax imposed for the privilege of doing business.
No good purpose could be served by any further discussion of the cases that were discussed in the original opinion; to-wit, Stewart Dry Goods Company v. Lewis, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054; Valentine v. Great Atlantic & Pacific Tea Co., 299 U.S. 32, 57 S.Ct. 56, 81 L.Ed. 22; State ex rel. Lane Drug Stores v. Simpson, 122 Fla. 582, 166 So. 227; State ex rel. Adams v. Lee, 122 Fla. 639, 166 So. 249; City of DeLand v. Florida Public Service Company, 119 Fla. 804, 161 So. 735; State ex rel. Cole v. Keller, 129 Fla. 276, 176 So. 176; and State ex rel. McKay v. Keller, 140 Fla. 346, 191 So. 542. However, it may be well to point out that in the case of State ex rel. Cole v. Keller, supra, in an opinion by Mr. Justice Terrell, he discussed the prohibition about income tax contained in Section 11 of Article IX of the Constitution, but decided the case on the ground that a municipality did not have the authority to levy the tax in question. In the opinion it was stated [129 Fla. 276, 176 So. 179]:
"* * * It does not contemplate income from other sources which are wholly independent of and separate from that obtained from his law practice. Limited in this manner, it might be possible, though we do not decide that question, to uphold the tax on authority of the Titusville Case [Clark v. City of Titusville, 184 U.S. 329, 22 S.Ct. 382, 46 L.Ed. 569]; but if it can be predicated on sources of income independent of his law practice, then it may be ruled by the Stewart Dry Goods *896 Case or it may run counter to section 11 of article 9 of the Constitution of Florida. The facts before us are not sufficient to warrant a decision of these questions. The distinction between the two cases is in some respects metaphysical, but if it was not and the facts were present, the answers could be very properly pretermitted because the case can be disposed of on the question of the city's power to impose the tax.
* * * * * *
"In the enactment of any kind of a tax law the Legislature, whether state or municipal, is torn between two conflicting interests: The predilection of the group on whom the tax is imposed to challenge it and the demand of the benefitted group to lay on all the traffic will bear. Common sense, being inarticulate, rarely points the way out of the dilemma. It should be the pole star to guide the legislative body in all matters, but it is too often paralyzed under the spell of vociferous groups that have the distinction of controlling large blocks of votes.
"Having reached the conclusion that the tax complained of was imposed without authority, it becomes unnecessary to discuss other questions urged. The motion to quash the alternative writ is denied."
In a Special Concurring Opinion, the then Chief Justice Ellis said:
"I agree to the conclusion reached upon the ground that no authority exists under the Charter of the City of Tampa to exercise such power of taxation as attempted by the ordinance attacked, if indeed such power could be conferred by the Legislature.
* * * * * *
"In the ordinance attacked an effort is obviously made to tax the studious labor, industry, and talent by which one attorney makes his franchise or license produce more income than another's. Besides, it is an attempted tax on income in violation of article 9, § 11, Constitution of Florida. See McCaskell v. State, 53 Ala. 510, Ann.Cas. 1912 A, 602, note."
In the later case of State ex rel. McKay v. Keller, supra, in an opinion by the late Justice Chapman, concurred in by the then Chief Justice Terrell, and Justices Whitfield, Brown and Thomas, this Court said [140 Fla. 346, 191 So. 547]:
"It is not difficult to distinguish between an excise tax or tax on the privilege of engaging in an occupation or a sales tax or transaction tax or an indirect sales tax and hold that they are not controlled or fall within the inhibitions of Section 11 of Article IX of the Constitution as shown by the decisions, supra. The relator is an attorney and the receipts, either net or gross, cannot be classified as an excise tax, sales tax or tax on the privilege of practicing law within the meaning of Section 11 of Article IX whereby it is unlawful to levy on the income of citizens or residents of Florida on the part of the State of Florida. The learning and legal ability of an attorney are among his business assets and differ materially from capital invested in a mercantile business.
"Ordinance No. 689-A is in contravention of and falls within the inhibitions of Section 11 of Article IX of the Constitution of Florida and is invalid and void as it applies to the relator. Careful consideration has been given to the briefs of counsel for the respective parties and the authorities cited have been examined. The motion to quash the alternative writ of mandamus filed on the part of the respondent is hereby denied.
"It is so ordered."
The petitioners' argument set forth in a paragraph of ground 3 which reads as follows:
"This Court's statement on page 11 of its opinion, `The chancellor overlooked the fact that the flat tax paid by the operator gave him the privilege *897 of selling individual chances and of conducting a pool,' strangely indicates that the Legislature is powerless to change the tax rate on dog tracks because of the flat tax, over-looking that in the state gasoline tax field a dealer's flat tax plus a gallonage tax has long been upheld with variations in these taxes from time to time."
is apparently the result of a misconception of the effect of our opinion; however, the example contained therein of the gallonage tax on gasoline constitutes a good illustration of the invalidity of the tax attempted to be imposed in this case. While it is true that the flat rate of tax on gasoline has been changed by the Legislature from time to time, the rate as changed has always applied to all filling stations alike. The gallonage tax on gasoline has always remained the same for every dealer. While the amount of tax which a dealer has paid has varied, from time to time, because of the variation in the number of gallons sold or business done, the rate has always remained the same. There has never been an attempt to classify such stations on the basis of the number of gallons sold and to impose a different rate upon each classification based upon any such formula.
In ground 7 petitioners apparently fail to recognize any difference or distinction between the regulation of a business on the one hand, and the imposition of a tax for the privilege of doing business on the other. The ground is a re-argument of the theory that the Legislature has the same power in imposing a tax that it has in regulating the dates upon which a track may operate. The State, through its Legislature, has admitted that it is in partnership in the gambling end of the race track business and is interested primarily in the amount of money the State can get from the operation of such tracks. The State, therefore, rewards the horse race track producing the most revenue by granting to it a certain privilege with reference to selecting dates within which to operate. There is no similarity between the principles involved in selecting dates on which to operate tracks and the imposition of additional tax upon the privilege of operating with the rate of the tax based solely upon gross receipts or the amount of business done.
The Legislature, and not the Court, declared the public policy of the State with reference to gambling when the Legislature declared that race track gambling "is a substantial business compatible to the best interests of the state and the taxes derived therefrom constitute an integral part of the tax structures of the state and counties. * * * and development of this business and influences and affects the financial stability of the state and counties." F.S. § 550.081, F.S.A.
In ground 9 petitioners complain that the Court did not take judicial notice of the power of dog tracks and their lobbyists and how their political influence has increased to such an extent that it has its effect in the selection of persons "for the high office of Governor." Petitioners insist that this may have been one of the reasons why the Legislature attempted to "trim the sails" of those engaged in the dog track business, which has been declared by the Legislature to be a legitimate business, and eliminate the same by the power of taxation. The questions raised in this ground are purely political and have no bearing upon the issues involved in this case. The Legislature has great power and has exercised such power on many occasions to improve our election laws and eliminate as far as practical undue influence in elections. These questions should be left to the Legislature and political power or influence should have no place in our determination of judicial questions.
It may be that if a group becomes so powerful in politics that it can name a Governor, it should be put out of business. It may be that the State should go back to that period of time prior to the 1931 Session of the Legislature when all gambling was upon an equal basis and was considered a crime; but the Legislature of 1931, F.S.A. § 550.01 et seq., changed the policy of this State with reference to gambling, and it is unnecessary in a petition for rehearing *898 or otherwise that the Court be reminded that the wisdom, policy, motive and determination with reference to that policy is a legislative and not a judicial function.
In the course of time other businesses may become so large and powerful that they may seek to exercise an undue influence in electing public officials. A combination of radios or television broadcasts and the publication and circulation of newspapers may in the future become targets for criticism because of their alleged political power. If, by this method of taxation, the "sails" of one legitimate business may be "trimmed" to reduce its power, the sails of any other legitimate business may be trimmed for the same purpose.
Indeed, this very kind of tax was attempted. In the case of City of Tampa v. Tampa Times Co., 153 Fla. 709, 15 So.2d 612, in striking down such a tax, in an opinion by Mr. Justice Adams, concurred in by Chief Justice Buford and Justices Terrell, Brown, Chapman, Thomas and Sebring, this court said:
"It would serve no useful purpose to cite other authorities inasmuch as we have concluded that the decision in this case is controlled by Grosjean v. American Press Co., supra, [297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660]. We cannot say that the tax levied here is arbitrary, unreasonable or was actuated by anything other than good motive, however we rest our decision solely upon the proposition that any license tax based on volume of circulation and graduated by scale as is here presented is void as impairing the freedom of the press guaranteed by the First and Fourteenth Amendment to the United States Constitution.
"The decree appealed from is affirmed."
If such a theory were ever countenanced it would be entirely possible, for example, to levy a progressive privilege tax on each daily newspaper published in the State, in accordance with a stated classification such as exists in the tax here involved, with a proviso in the statute that as to a daily circulation of 100,000 copies the tax would be 1¢ per copy but that for every copy beyond that figure an additional tax of 1¢ per copy would be levied, progressively, for each 10,000 papers sold.
It should not be difficult to discern that such a tax would depend solely on circulation and would operate to penalize every effort to increase circulation. Inequality becomes so apparent and obvious when the rate of taxation is increased based solely on the amount of business done that further discussion of the question is unnecessary.
The constitutional guarantees were not placed in our Constitutions in order to protect particular groups. These guarantees were placed there to apply alike to all those similarly situated, irrespective of power, influence, or station in life. They were meant to apply to the large and the small, the rich and the poor, the saint and the sinner, the believer and the infidel, irrespective of class, race or creed. The courts have no power to suspend these constitutional guarantees simply because of the fact that it may be the popular or expedient thing to do with reference to a particular group or situation. It would be a poor substitute, indeed, for our constitutional system of government for the courts ever to adopt a policy of upholding a law which violates constitutional guarantees merely because it may be the popular thing to do as to a particular group or on a given occasion. If popularity contests ever become the criteria for determining the validity of law, the uncontrolled will of the mob will become the substitute for constitutional government. It seems superfluous to say that a poll to ascertain public opinion should never be the necessary prerequisite to a judicial opinion under our constitutional system for the administration of Justice.
It is clear that in the original opinion we did not "strangely indicate that the Legislature is powerless to change the tax rate on dog tracks", or "immunize them from further taxation", or that we had any desire to do so. What we held, and now repeat, was that any attempted tax upon a new *899 classification based solely on the amount of the gross receipts of a business heretofore recognized by the Legislature as being a legitimate business constituted a denial of the Equal Protection clauses of the Fourteenth Amendment of the Constitution of the United States and the Declaration of Rights of the State of Florida. Parenthetically, it cannot necessarily be said that the objection to the attempted tax would be applicable if the increase in the rate was made to apply to all dog tracks alike.
The petition for re-hearing should be, and the same is hereby, denied.
ROBERTS, C.J., SEBRING, J., and LEWIS, Associate Justice, concur.
TERRELL, THOMAS and DREW, JJ., dissent.